Nos. 13-2343, 13-2344, and 13-2350

In the

# United States Court of Appeals
## For the First Circuit
_____

UNITED STATES OF AMERICA,
Appellee,

v.

CARMEN SOTO, PEDRO SOTO, and STEVEN SOTO,
Defendants-Appellants.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
District Court No. 1:11-CR-10310-MLW (Wolf, J.)
_____

**BRIEF FOR THE UNITED STATES**
_____

CARMEN M. ORTIZ
United States Attorney

JOHN A. CAPIN
BRIAN A. PÉREZ-DAPLE
Assistant U.S. Attorneys
District of Massachusetts

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

   I.     Offense Conduct: The Fraudulent Schemes to Procure Loans .......... 3

       A.    242 Main Street ......................................................... 5

       B.    55 Lawrence Street ................................................... 6

       C.    399 Orange Street ..................................................... 8

       D.    21 Dudley Street ....................................................... 9

   II.    Trial ............................................................................... 10

   III.  Rulings Under Review ................................................... 12

SUMMARY OF ARGUMENT .................................................................. 12

ARGUMENT ............................................................................................ 15

   I.     The District Court Correctly Denied Steven Soto's Suppression Motion ................................................................ 15

       A.    Background ................................................................ 16

           1.    The April 2006 Warrant to Arrest Steven Soto ...................... 16

           2.    The April 2006 Search of 56 Lawrence Road ........................ 16

           3.    The February 2007 Arrest of Steven Soto ............................. 17

i

4.     The February 2007 Vehicle Search ........................................ 18

5.     The March 2007 Search of the Laptop Computer................. 19

6.     The May 2007 Search of 56 Lawrence Road......................... 20

7.     Suppression of the Evidence Seized in the 2006 Search of
       56 Lawrence Road in a Prior Case ....................................... 21

8.     Denial of the Suppression Motion in This Case ................... 21

B.   Standard of Review.................................................................... 22

C.   The Independent Source Doctrine Precluded Suppression of
     the Evidence Seized from Soto's Computer and Residence ........ 23

II.    The District Court Did Not Abuse Its Discretion in Excluding
       Excerpts From the GAO Report ..................................................... 30

A.   Background ............................................................................... 31

B.   Standard of Review.................................................................... 32

C.   Argument................................................................................... 33

III.   The District Court Did Not Commit Plain Error by Failing to
       *Sua Sponte* Strike the Testimony of Jimma Shea ............................ 36

A.   Background ............................................................................... 36

B.   Standard of Review.................................................................... 37

C.   Argument................................................................................... 38

IV.    The Defendants Waived a Claim of Error In the District Court's
       Good Faith Instructions But, Even if Forfeited, Their Claim Fails .. 41

A.   Background ............................................................................... 41

B.   Standard of Review.................................................................... 45

C.    The Defendants Waived Their Challenge to the Good Faith Instructions ............................................................................ 45

D.    The Defendants' Challenge to the Good Faith Instructions Fails Even if Reviewed for Plain Error ...................................... 47

V.    There Was No Plain Error in the District Court's Reasonable Doubt Instructions ................................................................. 54

A.    Background ............................................................................. 54

B.    Standard of Review................................................................. 55

C.    Argument................................................................................. 56

VI.    Ample Evidence Supported the Mailing Element of Steven Soto's Mail Fraud Convictions................................................... 58

A.    Standard of Review................................................................. 58

B.    Argument................................................................................. 59

VII.    Steven Soto's Double Jeopardy Claim is Waived But in Any Event Lacks Merit..................................................................... 61

VIII.    The District Court Did Not Plainly Err in Ordering Carmen Soto to Pay $792,559 in Restitution ..................................... 65

A.    Background ............................................................................. 65

1.    The Presentence Investigation Report .................................. 65

2.    The Sentencing Hearing ....................................................... 67

B.    Standard of Review................................................................. 69

C.    Argument................................................................................. 70

CONCLUSION.................................................................................... 73

CERTIFICATE OF COMPLIANCE .......................................................... 75

CERTIFICATE OF SERVICE ................................................................. 76

# TABLE OF AUTHORITIES

## CASES

*BCS Services, Inc. v. Heartwood 88, LLC*,
    637 F.3d 750 (7th Cir. 2011) ................................................................. 73

*Henderson v. Kibbe*,
    431 U.S. 145 (1977) ............................................................................. 45

*Illinois v. Gates*,
    462 U.S. 213 (1983) ............................................................................. 27

*Johnson v. Zerbst*,
    304 U.S. 458 (1938) ............................................................................. 45

*Loughrin v. United States*,
    134 S. Ct. 2384 (2014)......................................................................... 47

*McNally v. United States*,
    483 U.S. 350 (1987) ............................................................................. 50

*Murray v. United States*,
    487 U.S. 533 (1988) ........................................................................23, 27

*Neder v. United States*,
    527 U.S. 1 (1999)................................................................................. 34

*Nix v. Williams*,
    467 U.S. 431 (1984) ............................................................................. 23

*Paroline v. United States*,
    134 S. Ct. 1710 (2014)......................................................................... 71

*Pereira v. United States*,
    347 U.S. 1 (1954)................................................................................. 59

*Robers v. United States*,
    134 S. Ct. 1854 (2014)......................................................................... 70

*Sanchez v. United States,*
    740 F.3d 47 (1st Cir. 2014) ..................................................................... 27

*United States v. Adams,*
    375 F.3d 108 (1st Cir. 2004) ................................................................... 35

*United States v. Allen,*
    491 F.3d 178 (4th Cir. 2007) ................................................................... 47

*United States v. Alzanki,*
    54 F.3d 994 (1st Cir. 1995) ..................................................................... 33

*United States v. Anthony,*
    545 F.3d 60 (1st Cir. 2008) ..................................................................... 32

*United States v. Antonakopoulos,*
    399 F.3d 68 (1st Cir. 2005) ..................................................................... 69

*United States v. Appolon,*
    695 F.3d 44 (1st Cir. 2012) ..................................................................... 67

*United States v. Berkovich,*
    168 F.3d 64 (2d Cir. 1999) ..................................................................... 51

*United States v. Brown,*
    500 F.3d 48 (1st Cir. 2007) ..................................................................... 35

*United States v. Brown,*
    669 F.3d 10 (1st Cir. 2012) ..................................................................... 45

*United States v. Cartelli,*
    272 Fed. Appx. 66 (2d Cir. 2008) ........................................................... 51

*United States v. Casas,*
    356 F.3d 104 (1st Cir. 2004) ................................................................... 38

*United States v. Cejas,*
    761 F.3d 717 (7th Cir. 2014) ................................................................... 64

*United States v. Chagra,*
   653 F.2d 26 (1st Cir. 1981) ..............................................................63, 43

*United States v. Cheal,*
   389 F.3d 35 (1st Cir. 2004) ..............................................................11, 59

*United States v. Chiaradio,*
   684 F.3d 265 (1st Cir. 2012) ...................................................... 27, 71, 72

*United States v. Cleveland,*
   106 F.3d 1056 (1st Cir. 1997) .........................................................56, 57

*United States v. DeCologero,*
   364 F.3d 12 (1st Cir. 2004) ...................................................................... 64

*United States v. DeCologero,*
   530 F.3d 36 (1st Cir. 2008) ...................................................................... 63

*United States v. DeRosier,*
   501 F.3d 888 (8th Cir. 2007) ................................................................... 47

*United States v. Dessesaure,*
   429 F.3d 359 (1st Cir. 2005) ............................................................24, 26

*United States v. Diaz,*
   670 F.3d 332 (1st Cir. 2012) ................................................................... 35

*United States v. Dowlin,*
   408 F.3d 647 (10th Cir. 2005) ................................................................. 56

*United States v. Felix,*
   182 F.3d 82 (1st Cir. 1999) ..................................................................... 29

*United States v. Felix,*
   503 U.S. 378 (1992) ................................................................................. 64

*United States v. Ferguson,*
   676 F.3d 260 (2d Cir. 2011) ....................................................... 50, 51, 52

vii

*United States v. Flemmi*,
  402 F.3d 79 (1st Cir. 2005) ...................................................... 32

*United States v. Floyd*,
  740 F.3d 22 (1st Cir. 2014) ...................................................... 29

*United States v. Gallardo-Ortiz*,
  666 F.3d 808 (1st Cir. 2012) .................................................... 73

*United States v. George*,
  761 F.3d 42 (1st Cir. 2014) ...................................................... 35

*United States v. Goldblatt*,
  813 F.2d 619 (3d Cir. 1987) ..................................................... 50

*United States v. Gole*,
  158 F.3d 166 (2d Cir. 1998) ................................................50, 51

*United States v. Harris*,
  660 F.3d 47 (1st Cir. 2011) ...................................................... 58

*United States v. Hebshie*,
  549 F.3d 30 (1st Cir. 2008) .................................................59, 60

*United States v. Hickey*,
  580 F.3d 922 (9th Cir. 2009) ................................................... 49

*United States v. Ingram*,
  490 Fed. Appx. 363 (2d Cir. 2012) ......................................... 51

*United States v. Innarelli*,
  524 F.3d 286 (1st Cir. 2008) .................................................... 71

*United States v. Irving*,
  665 F.3d 1184 (10th Cir. 2011) ............................................... 33

*United States v. Jones*,
  674 F.3d 88 (1st Cir. 2012) ...................................................... 55

*United States v. Josleyn,*
99 F.3d 1182 (1st Cir. 1996) ............................................................41, 44

*United States v. Judd,*
889 F.2d 1410 (5th Cir. 1989)........................................................ 50

*United States v. Kearney,*
672 F.3d 81 (1st Cir. 2012)....................................................... 72

*United States v. Kenrick,*
221 F.3d 19 (1st Cir. 2000)...............................................47, 49

*United States v. Koh,*
199 F.3d 632 (2d Cir. 1999)....................................................... 51

*United States v. Kornegay,*
410 F.3d 89 (1st Cir. 2005).................................................... 23

*United States v. Lakich,*
23 F.3d 1203 (7th Cir. 1994) ................................................. 46

*United States v. LaPlante,*
714 F.3d 641 (1st Cir. 2013) ................................................. 47

*United States v. Leonard,*
529 F.3d 83 (2 nd Cir. 2008)............................................51, 52

*United States v. Levis,*
488 Fed. Appx. 481 (2d Cir. 2012).......................................... 51

*United States v. Lopez Garcia,*
672 F.3d 58 (1st Cir. 2012).................................................... 40

*United States v. Marder,*
48 F.3d 564 (1st Cir. 1995)................................................... 46

*United States v. Marrero,*
991 F.2d 786, 1993 WL 89804 (1st Cir. 1993) ......................... 63

*United States v. Marston,*
   694 F.3d 131 (1st Cir. 2012) ...................................................... 58

*United States v. Marzo,*
   312 Fed. Appx. 356 (2d Cir. 2008) ............................................. 51

*United States v. Matos,*
   611 F.3d 31 (1st Cir. 2010) ........................................................ 69

*United States v. McCann,*
   366 F.3d 46 (1st Cir. 2004) ........................................................ 59

*United States v. Medina,*
   427 F.3d 88 (1st Cir. 2005) ........................................................ 46

*United States v. Medina-Martinez,*
   396 F.3d 1 (1st Cir. 2005) .......................................................... 45

*United States v. Mitchell,*
   85 F.3d 800 (1st Cir. 1996) ........................................................ 46

*United States v. Morris,*
   99 F.3d 476 (1st Cir. 1996) ........................................................ 63

*United States v. Mueffelman,*
   470 F.3d 33 (1st Cir. 2006) ........................................................ 47

*United States v. Neto,*
   659 F.3d 194 (1st Cir. 2011) ...................................................... 63

*United States v. Newell,*
   658 F.3d 1 (1st Cir. 2011) .......................................................... 45

*United States v. O'Connor,*
   656 F.3d 630 (7th Cir. 2011) ...................................................... 46

*United States v. Olano,*
   507 U.S. 725 (1993) .............................................................45, 46

x

*United States v. O'Shea,*
    426 F.3d 475 (1st Cir. 2005) ..............................................................57, 58

*United States v. Oslund,*
    453 F.3d 1048 (8th Cir. 2006)...................................................................... 40

*United States v. Paniagua-Ramos,*
    251 F.3d 242 (1st Cir. 2001) ....................................................................... 45

*United States v. Pimental,*
    380 F.3d 575 (1st Cir. 2004) ....................................................................... 59

*United States v. Pires,*
    642 F.3d 1 (1st Cir. 2011)......................................................................32, 35

*United States v. Ranney,*
    298 F.3d 74 (1st Cir. 2002) ........................................................................ 57

*United States v. Rodriguez,*
    525 F.3d 85 (1st Cir. 2008) ........................................................................ 37

*United States v. Rojo-Alvarez,*
    944 F.2d 959 (1st Cir. 1991) ...................................................................... 46

*United States v. Rossomando,*
    144 F.3d 197 (2d Cir. 1998)....................................................49, 50, 51, 52

*United States v. Rostoff,*
    53 F.3d 398 (1st Cir. 1995) ........................................................................ 68

*United States v. Rybicki,*
    38 Fed. Appx. 626 (2d Cir. 2002) ............................................................. 52

*United States v. Salas-Fernandez,*
    620 F.3d 45 (1st Cir. 2010).......................................................................... 69

*United States v. Sepulveda,*
    15 F.3d 1161 (1st Cir. 1993) ....................................................................... 33

*United States v. Shrader,*
    675 F.3d 300 (4th Cir. 2012) ................................................................... 63

*United States v. Siciliano,*
    578 F.3d 61 (1st Cir. 2009) ...........................................................23, 24, 25, 26

*United States v. Soto,*
    720 F.3d 51 (1st Cir. 2013) ...................................................................21, 61

*United States v. Soto,*
    779 F. Supp. 2d 208 (D. Mass. 2011) ...................................................... 22

*United States v. Soto,*
    No. 07-10288-JLT, 2010 WL 2572879 (D. Mass. June 23, 2010) ............. 21

*United States v. Spink,*
    503 F.3d 619 (7th Cir. 2007) ...............................................................47, 48

*United States v. Stern,*
    13 F.3d 489 (1st Cir. 1994) ..................................................................... 71

*United States v. Tiru-Plaza,*
    766 F.3d 111 (1st Cir. 2014) ................................................................... 22

*United States v. Tracy,*
    989 F.2d 1279 (1st Cir. 1993) ................................................................. 62

*United States v. Valdivia,*
    680 F.3d 33 (1st Cir. 2012) ..................................................................... 50

*United States v. Vazquez-Botet,*
    532 F.3d 37 (1st Cir. 2008) ..................................................................... 33

*United States v. Vizcarrondo-Casanova,*
    763 F.3d 89 (1st Cir. 2014) ..................................................................... 32

*United States v. Walker,*
    665 F.3d 212 (1st Cir. 2011) ................................................................... 63

*United States v. Wallace*,
  461 F.3d 15 (1st Cir. 2006) ....................................................... 32

*United States v. Wallach*,
  935 F.2d 445 (2d Cir. 1991) ....................................................... 50

*United States v. Washington*,
  434 F.3d 7 (1st Cir. 2006) ......................................................... 62

*United States v. Weathers*,
  186 F.3d 948 (D.C. Cir. 1999) .................................................. 63

*United States v. Welch*,
  327 F.3d 1081 (10th Cir. 2003) ................................................. 50

*United States v. Weston*,
  960 F.2d 212 (1st Cir. 1992) ..................................................... 45

## STATUTES, RULES, AND SENTENCING GUIDELINES

18 U.S.C. § 924(c) ........................................................................ 64

18 U.S.C. § 1028A ................................................................. 3, 61, 62

18 U.S.C. § 1341 ........................................................................ 2, 61

18 U.S.C. § 1343 ............................................................................ 61

18 U.S.C. § 1344 ..................................................................... 47, 61

18 U.S.C. § 3231 ............................................................................. 1

18 U.S.C. § 3553(a) ...................................................................... 73

18 U.S.C. § 3663A ........................................................................ 66

18 U.S.C. § 3663A(a)(1) ......................................................... 70, 73

18 U.S.C. § 3663A(a)(2) ............................................................... 70

18 U.S.C. § 3663A(b)(1)(B) ................................................................ 70

18 U.S.C. § 3663A(c)(1)(A)(ii) .......................................................... 70

18 U.S.C. § 3664(f)(1)(A) ................................................................. 73

28 U.S.C. § 1291 ................................................................................. 1

Fed. R. App. P. 4(b)(2) ........................................................................ 1

Fed. R. Crim. P. 12(b)(3)(A) ............................................................. 63

Fed. R. Crim. P. 12(b)(3)(B) ............................................................. 63

Fed. R. Crim. P. 29 ........................................................................... 58

Fed. R. Crim. P. 52(b) ...................................................................... 46

Fed. R. Evid. 103(a)(1)(A) ................................................................ 38

Fed. R. Evid. 103(a)(1)(B) ................................................................ 38

Fed. R. Evid. 103(a)(2) ...................................................................... 32

Fed. R. Evid. 403 ....................................................................... passim

Fed. R. Evid. 404(a) .......................................................................... 39

Fed. R. Evid. 404(a)(1) ...................................................................... 39

Fed. R. Evid. 611(a) .......................................................................... 38

Fed. R. Evid. 701 .............................................................................. 40

Fed. R. Evid. 801 .............................................................................. 39

Fed. R. Evid. 801(c)(2) ...................................................................... 39

Fed. R. Evid. 802 .............................................................................. 39

Fed. R. Evid. 803(8) ................................................................ 31

U.S.S.G. § 2B1.1 ...............................................................65, 71

U.S.S.G. § 2B1.1(b)(1) ........................................................... 65

U.S.S.G. § 2B1.1(b)(1) cmt.  n.3(A) ........................................ 65

U.S.S.G. § 2B1.1(b)(1) cmt. n.(3)(A)(i) ...............................65, 72

## JURISDICTIONAL STATEMENT

These are appeals from final judgments of conviction and sentence in a criminal case. The district court exercised jurisdiction under 18 U.S.C. § 3231 and entered judgment on October 25, 2013. CSA 1-31.[1] The defendants filed timely notices of appeal on that same day. SA 503; PA 190-92; Dkt. 232; *see* Fed. R. App. P. 4(b)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly denied suppression of evidence seized during two searches conducted pursuant to warrants for which the supporting affidavits mentioned information from a prior unconstitutional search.

2.      Whether the district court abused its discretion in excluding, under Federal Rule of Evidence 403, excerpts from a report by the Government Accountability Office about "the recent financial crisis."

3.      Whether the district court committed plain error by not *sua sponte* striking testimony by Jimma Shea that she believed Pedro Soto had tricked her and tried to steal her house.

---

[1] "CSA" refers to the sealed supplemental appendix filed by Carmen Soto. "CA" refers to her appendix. "SA" and "PA" refer to the respective appendices of Steven and Pedro Soto. "Ex." refers to exhibits admitted at trial. "Dkt." refers to district court docket entries.

4.    Whether the defendants waived their claim of error in the jury instructions on good faith, or if forfeited, whether there was reversible plain error.

5.    Whether there was reversible plain error in the district court's reasonable doubt instructions.

6.    Whether there was sufficient evidence to support the "mailings" element of the mail fraud charges against Steven Soto.

7.    Whether the charges against Steven Soto should have been dismissed on double jeopardy grounds because of Soto's prior fraud and aggravated identity theft convictions.

8.    Whether the district court committed reversible plain error in ordering Carmen Soto to pay $792,559 in restitution after the district court concluded that those losses were a reasonably foreseeable result of Soto's conduct.

## STATEMENT OF THE CASE

The defendants—Steven Soto and his parents Carmen and Pedro Soto— operated a real estate brokerage firm through which they orchestrated several fraudulent real estate transactions in Massachusetts in late 2006 and early 2007. Following a jury trial, Steven and Pedro Soto were each convicted on five counts of mail fraud, in violation of 18 U.S.C. § 1341. SA 488-90. Carmen

2

Soto was convicted on four counts of mail fraud. SA 489-90. Steven and Pedro Soto were also convicted on six and three counts, respectively, of aggravated identity theft, in violation of 18 U.S.C. § 1028A. SA 488-89.

The district court (Wolf, J.) sentenced Carmen Soto to one year and a day of imprisonment, to be followed by three years of supervised release, and ordered her to pay $792,559 in restitution. CSA 2-6. Pedro Soto was sentenced to 48 months of imprisonment, to be followed by three years of supervised release, and ordered to pay $1,055,474 in restitution. CSA 13-16. Steven Soto was sentenced to 65 months of imprisonment, to be followed by four years of supervised release, and ordered to pay $1,055,474 in restitution. CSA 23-27.

These appeals followed.

## I.     Offense Conduct: The Fraudulent Schemes to Procure Loans

The Sotos owned and operated Paradise Real Estate, a real estate brokerage firm in Lynn, Massachusetts. Dkt. 308, at 71-72; Dkt. 317, at 50. Through that firm, they conducted—and profited from—a series of fraudulent real estate transactions. The transactions, which are described in additional detail below, took a variety of forms. In each case, however, one or more of the Sotos used the identity of another individual to consummate the sale of real estate and caused a substantial amount of false information to be

3

communicated to the mortgage lender. Most of the properties went into foreclosure soon after the sale. *See* Exs. 26B, 26E, 27A, 27B.

The Sotos used Gregory Bradley's identity in multiple transactions. Bradley was in prison between August 2006 and September 2008. Dkt. 298, at 18-19; Dkt. 317, at 170-71. Shortly after Bradley entered prison, Steven Soto approached Bradley's aunt, Kim Litwin, and proposed to help out Bradley by conducting real estate transactions in his name. Dkt. 298, at 20-21, 82-83. Litwin agreed after consulting with Bradley. Dkt. 298, at 85-88. Soto used Bradley's driver's license and credit card, impersonated Bradley, forged documents to make it appear as if Bradley was gainfully employed, and purported to act on Bradley's behalf using a forged power of attorney. Dkt. 298, at 30-31, 37-38, 120-21; Dkt. 309, at 15; Dkt. 316, at 109-14; Dkt. 317, at 79; *see infra* pp. 5-9.

Another individual whose identity was used in multiple transactions was Milagros Espinal, a notary public. Dkt. 318, at 54-56. Unbeknownst to Espinal, Steven Soto obtained a notary kit in her name. Dkt. 318, at 66-72. The Sotos used the notary kit in numerous transactions to make it appear that documents were legitimately notarized. *See infra* p. 5-8.

4

### A.    242 Main Street

In the fall of 2006, Steven Soto arranged, through Kim Litwin, for Gregory Bradley to purchase 242 Main Street in Springfield, Massachusetts. Dkt. 298, at 20-21, 23, 88-89. Pedro Soto owned the property, which he had purchased earlier in the year. Dkt. 298, at 31; Dkt. 308, at 142-43; Dkt. 310, at 64.

To obtain a loan, someone posing as Bradley spoke to a mortgage loan officer—by phone, because Carmen or Pedro Soto told the loan officer that Bradley was unable to meet in person. Dkt. 318, at 13-17, 25-27. As ultimately reflected on the loan application, the loan officer was told, among other things, that Bradley was a store manager at Drestars barbershop, Ex. 1A, at 1, a barbershop that Steven Soto had opened in Lynn, Massachusetts, Dkt. 317, at 101-03, when in fact Bradley was in prison and unemployed, Dkt. 298, at 31-32. The loan officer was also told that Bradley possessed $14,191 in liquid assets. Ex. 1A, at 2. That was the amount in Litwin's bank account. Dkt. 298, at 32. Litwin had been instructed by Steven Soto to add Bradley's name to her account to make it appear that Bradley possessed sufficient assets to qualify for a loan. Dkt. 298, at 24, 32.

Steven Soto and Kim Litwin attended the closing for 242 Main Street in November 2006. Dkt. 298, at 31; *see* Ex. 1A. Using the counterfeit Espinal

5

notary kit, Soto had forged a document purporting to give Litwin power of attorney to conduct the transaction on behalf of Bradley. Dkt. 298, at 26-30; Dkt. 308, at 150-55; Dkt. 310, at 45-46, 66-68; Dkt. 318, at 70-75; *see* Ex. 1D.[2] At the closing, Litwin signed documents containing false information about, among other things, Bradley's employment, assets, and intent to live in the property as his primary residence. Dkt. 298, at 31-36; Dkt. 308, at 149-50; *see* Ex. 1A.

### B. 55 Lawrence Street

Fifty-five Lawrence Street was a three-family home in Salem, Massachusetts, owned by Beatrice Jimma Shea. Dkt. 313, at 107-09. In the fall of 2006, Shea asked Pedro Soto, who had previously helped her find a tenant for one of the three units, if he would help her find another tenant or, in the alternative, help her sell the property. Dkt. 313, at 108-09, 111-13; Dkt. 314, at 51-53. Soto arranged for Shea to enter into an agreement, ostensibly with Gregory Bradley, leasing 55 Lawrence Street to Bradley and giving him the

---

[2] Prior to the closing, an attorney representing the lender became suspicious. Dkt. 310, at 65-66. Steven Soto arranged for the attorney to speak by phone with someone purporting to be Bradley. Dkt. 310, at 68-70. Soto also sent the attorney forged documents regarding Milagros Espinal to assuage concerns about the authenticity of the notary stamp on the power of attorney. Dkt. 310, at 44-46, 66-68; Dkt. 318, at 70-75; Ex. 1D.

option to purchase the property and convert it into condominiums. Dkt. 313, at 114-16, 121-23, 138-43; Dkt. 314, at 63-68; Ex. 98.

Steven Soto later went to 55 Lawrence Street posing as Bradley to try to get Shea to sign documents that would allow him to sell the units as condominiums. Dkt. 313, at 117-18, 120-21, 128-35. After Shea refused, Dkt. 314, at 18-19, Soto forged her signature on documents, Ex. 26A; *see* Dkt. 313, at 137-38, 142-52; Dkt. 314, at 24-25, 31-32, 112; Dkt. 317, at 106-07. The counterfeit notary kit in Espinal's name was used to make it appear that the documents were properly notarized. Ex. 26A; Dkt. 318, at 69-70. The documents were then used to consummate the sale of each of the three units in 55 Lawrence Street.

Pedro and Steven Soto arranged for the sale of Unit 1 to Pamela Landess in January 2007. *See* Dkt. 298, at 168-89; Ex. 2A. Pedro Soto recruited Landess as a straw buyer. Dkt. 298, at 166-75, 229. For the closing, Steven Soto forged Jimma Shea's signature—and affixed a notary stamp using the counterfeit Espinal notary kit—on a document purporting to give Gregory Bradley power of attorney for Shea. *See* Ex. 26A. Using the forged power of attorney, Soto signed Bradley's name on closing documents as attorney in fact for Shea. *See* Ex. 2A.

7

Carmen Soto recruited Medelin de la Cruz as a straw buyer to purchase Units 2 and 3. Dkt. 314, at 168-79; Dkt. 315, at 47, 86-88; *see* Exs. 3A, 4A. Carmen and Steven Soto put together Cruz's loan application, which substantially overstated her salary, did not disclose prior mortgages, and falsely represented that Cruz intended to make each of the units her primary residence. Dkt. 314, at 173-75; Dkt. 315, at 19-24, 36-38.

The closings for Units 2 and 3 took place in January and February 2007, respectively. *See* Exs. 3A, 4A. Steven Soto was present at the closing for Unit 2 and, with the forged power of attorney, signed Gregory Bradley's name on the documents as attorney in fact for Shea, the seller. Ex. 3A; Dkt. 315, at 17; Dkt. 317, at 106. Kim Litwin attended the closing for Unit 3 as attorney in fact for Bradley, the seller. Dkt. 298, at 41, 115, 118; Dkt. 314, at 151-52. Steven Soto had transferred title in Unit 3 to Bradley (from Shea) using the counterfeit Espinal notary kit. *See* Ex. 26A; Dkt. 298, at 42-45.

### C.    399 Orange Street

Steven Soto arranged for the purchase of 399 Orange Street in Springfield, Massachusetts, in Gregory Bradley's name. Dkt. 298, at 36-37, 51-52; Ex. 5A. Soto posed as Bradley at the closing in January 2007 and signed Bradley's name on closing documents that contained false information. Dkt. 298, at 37-39, 110-11; Dkt. 317, at 106-07; *see* Dkt. 313, at 61-72; Ex. 5A.

8

The loan application signed by Soto, for example, stated that Bradley—who was in prison at the time and unemployed—had a monthly income of $11,500 from employment at Drestars Star barbershop (the barbershop opened by Soto) and ownership of Aggressive Construction, *see* Ex. 5A, which was a company formed by Soto in Bradley's name, Dkt. 298, at 31-32; Dkt. 316, at 72-88. In addition, the liability section of the loan application omitted the prior mortgage obtained in Bradley's name to purchase 242 Main Street. *See* Ex. 5A.

Pedro Soto assisted with the purchase of 399 Orange Street. *See* Dkt. 313, at 75-78. Among other things, his phone number was used as the contact number for Bradley in connection with the transaction. Dkt. 298, at 157; Dkt. 311, at 82; Dkt. 312, at 142-43; Dkt. 316, at 14, 150-57. The loan processor called that number two days before the closing and spoke with someone who purported to be Bradley and who verified the (false) information on the loan application. Dkt. 316, at 14-15.

### D.    21 Dudley Street

Around January 2007, the owners of 21 Dudley Street in Haverhill, Massachusetts, Karen and Christopher Faison, agreed to let the Sotos convert the property into three condominiums and keep any proceeds from the sale of the units above the $365,000 that the Faisons had paid to purchase the

property. Dkt. 308, at 70-75. Carmen Soto arranged for Angel Rodriguez—a longtime family friend—to purchase two of the units. *See* Dkt. 155-64.[3]

Initially, Rodriguez voluntarily agreed to purchase the units, viewing them as investments, but he changed his mind before closing and told Carmen Soto that he did not want to go through with the purchases. Dkt. 311, at 159-69; Dkt. 312, at 10-12; Dkt. 313, at 82-88. Carmen Soto directed Yessica Amaro—Steven Soto's girlfriend, and Rodriguez's stepsister—to attend the May 2007 closings on Rodriguez's behalf. Dkt. 317, at 91-94. Amaro signed a power of attorney—containing Rodriguez's forged signature—that was notarized by Carmen Soto's cousin, Yaimet Vallejo. Dkt. 312, at 13-17; Dkt. 317, at 97-99; Exs. 26D, 70. On the basis of that power of attorney, Amaro signed documents containing false information that caused Rodriguez, without his authorization, to obtain two loans and purchase two units in 21 Dudley Street. Dkt. 317, at 94-97, 99-100; Exs. 6A, 7A.

## II.    Trial

The defendants were charged with multiple counts of mail fraud and aggravated identity theft. *See* CA 48-75. The district court denied a motion to suppress filed by the defendants, SA 422-41, and they were tried before a jury.

---

[3] The third unit was purchased by another individual who later defaulted on the loan. Dkt. 313, at 38-40. The Sotos were not charged with fraud in connection with that transaction.

10

The defendants pursued a "good faith" or "condonation" defense at trial. *See* Dkt. 83, at 19-20.[4] They argued that they lacked the intent to defraud, an element of mail fraud, *see United States v. Cheal*, 389 F.3d 35, 41 (1st Cir. 2004), because the mortgage lenders were aware of and tacitly approved their conduct. Dkt. 319, at 66-79, 88-90 99-108; *see* Dkt. 319, at 155-56 (jury instructions). According to the defendants, underwriting standards were lax and mortgage lenders were primarily interested in making as many loans as possible, regardless of the likelihood that the loans would go into default. Dkt. 319, at 67-73, 99-103. The Sotos argued that the tacit approval of their conduct by the mortgage lenders tended to show that they acted in good faith. *See* Dkt. 83, at 20; Dkt. 319, at 67-68, 78-79, 88-89, 104-05.

The defendants presented one witness, *see* Dkt. 318, at 91-92, 123-24, and developed their defense theory largely through cross-examination of government witnesses. For example, an employee of one mortgage lender testified that in 2006 and 2007 "closing was king," Dkt. 315, at 102; Dkt. 316, at 50, and although underwriting standards were not relaxed in order to facilitate closing, Dkt. 316, at 51, the focus at the time was "making sure the loan closed" and "trying to get the borrower to the closing table . . . as quickly

---

[4] As correctly noted by Carmen Soto, *see* Carmen Br. 10 n.4, the word "condonation" is erroneously transcribed as "condemnation" throughout the trial transcript. *See, e.g.*, Dkt. 308, at 6.

and as fast as possible to make sure we got the loan to work," Dkt. 316, at 50. Similarly, Pamela Landess, a straw buyer recruited by Pedro Soto, testified that she disclosed she had no intention of making the purchased property her primary residence—contrary to the closing documents—yet the attorney for the lender let the closing proceed. Dkt. 298, at 185-87; Dkt. 317, at 25-26.

The jury rejected the Sotos' defense and convicted them on all counts except two counts of mail fraud against Steven Soto. SA 488-90. The defendants were sentenced as described above. *See supra* p. 3.

## III.   Rulings Under Review

The rulings of the district court that are under review are identified below in the sections addressing the respective claims raised by the defendants. *See infra* pp. 21-22, 31-32, 58. For a number of the claims, there is no ruling under review because the defendants did not raise an objection and therefore the district court did not announce a ruling.

## SUMMARY OF ARGUMENT

1.     The district court correctly denied Steven Soto's motion to suppress evidence from the searches of his computer and residence in 2007. Although the warrant affidavits for those searches mentioned evidence obtained in an unlawful search in 2006, the court correctly concluded that the independent source doctrine precluded suppression. There was no clear error

12

in the court's finding that the police would have sought the 2007 warrants even if the unlawful 2006 search had never occurred. And when the affidavits in support of the 2007 searches are excised of information from the 2006 search, the remaining allegations established a sufficient likelihood that evidence of criminal activity would be found in Soto's computer and residence.

2.     The district court acted well within its discretion when it excluded excerpts from a Government Accountability Office report under Federal Rule of Evidence 403. The court correctly concluded that the report had little if any relevance. The report contained an ambiguous reference to the "dramatic loosening in underwriting standards leading up to the [recent financial] crisis" but did not speak to the practices of the particular lenders in this case, let alone show that the lenders knowingly provided loans on the basis of false information. Moreover, any minimal probative value the report may have had was substantially outweighed by the danger of confusing the issues.

3.     The district court did not commit plain error by failing to *sua sponte* strike testimony by Jimma Shea. The allegedly erroneous testimony provided context for a recorded conversation that was admitted into evidence. It is not clear or obvious that the testimony was inadmissible under the Federal Rules of Evidence, and there is no reasonable likelihood that the testimony affected the outcome of the trial.

13

4.      The defendants waived any challenge to the jury instructions on good faith by requesting a good faith instruction, assenting to the instructions drafted by the district court, and explicitly relying on the instructions during closing arguments. In any event, there was no reversible plain error in the instructions. The instructions correctly conveyed the intent requirement for the offense of mail fraud. The Second Circuit decision the defendants rely on cannot establish clear or obvious error because its narrow holding is inapplicable in the circumstances of this case and, in any case, inconsistent with precedent from this Court.

5.      There was no error in the jury instructions on reasonable doubt, let alone plain error. This Court has approved instructions that are largely indistinguishable from the instructions in this case.

6.      Ample evidence supported the jury's finding that Steven Soto caused the mails to be used in furtherance of schemes to defraud the mortgage lenders. The evidence established that documents containing false information used to procure loans were mailed to the lenders after each closing.

7.      Steven Soto waived his double jeopardy claim by failing to seek dismissal of the indictment before trial. In any event, the claim lacks merit. The Double Jeopardy Clause does not bar successive prosecutions for different criminal offenses. Soto was prosecuted in 2011 for schemes to fraudulently

14

obtain motorcycles and automobiles and identity theft in furtherance of those frauds. He was prosecuted in this case for schemes to fraudulently obtain loans from mortgage lenders and identity theft in furtherance of those frauds. The criminal offenses prosecuted in the two cases were different even though they were proved by overlapping evidence.

8.    The district court did not commit reversible plain error by ordering Carmen Soto to pay $792,559 in restitution, the amount of money lent by the mortgage lenders reduced by the amount retrieved by the lenders upon selling the collateral after foreclosure. The district court found that it was reasonably foreseeable to Soto, an experienced real estate professional, that the victims would suffer those losses. The court's findings sufficiently established proximate causation.

## ARGUMENT

### I.    The District Court Correctly Denied Steven Soto's Suppression Motion

Steven Soto contends that the district court erred in denying his motion to suppress evidence from searches of his home and computer. Steven Br. 32-49. His arguments lack merit.

15

## A.    Background

### 1.    The April 2006 Warrant to Arrest Steven Soto

In March and April 2006, investigators learned that Steven Soto had used forged checks and a counterfeit notary seal from Milagros Espinal to purchase motorcycles. SA 99, 208-22, 226, 362. They also received a report that Soto had negotiated counterfeit checks at Eastern Bank, prompting the bank to create a fraud alert regarding Soto on March 16, 2006. SA 211, 428. The police obtained a warrant to arrest Soto on April 28, 2006. SA 78-79, 98, 226.

### 2.    The April 2006 Search of 56 Lawrence Road

Later in the day on April 28, 2006, the police went to 56 Lawrence Road, where the Sotos resided, in order to execute the arrest warrant. SA 78-79. One of the officers went through a fenced-in area, looked into a garage window with a flashlight, and observed a license plate on a motorcycle that had been reported stolen. SA 113-14.

The police were unsuccessful in locating Steven Soto but applied for a warrant to search 56 Lawrence Road based on, among other things, the sighting of the stolen motorcycle. SA 97-100. A search of the house and a Dell desktop computer found inside the house turned up, among other things, three stolen motorcycles and material related to the use of counterfeit checks to

16

purchase motorcycles. SA 79-81, 101-11, 226, 429. After the searches, law enforcement officers continued to investigate Soto while state authorities initiated a prosecution. SA 429.

### 3.    The February 2007 Arrest of Steven Soto

Almost a year later, on February 2, 2007, Steven Soto went to Eastern Bank, posing as Gregory Bradley, and cashed a check from an account that Soto had opened in December 2006 under Bradley's name for the business Aggressive Construction. SA 84, 230, 232. Bank employees became suspicious, and the bank's internal fraud investigator determined that the person purporting to be Bradley matched the photo from the March 2006 bank alert that had identified Soto as having negotiated counterfeit checks. SA 232, 276-77. When Soto returned to the bank later in the day and attempted to cash a check in Bradley's name, bank employees contacted the Saugus Police Department. SA 430.

Soto told a police officer who responded to the scene that he had power of attorney for Gregory Bradley, and he presented a document containing a notary stamp from Milagros Espinal that purported to give him that authority. SA 230. Soto said that Bradley was in jail and that they were friends and business partners. SA 230. Officers placed Soto in custody. SA 85.

### 4.    The February 2007 Vehicle Search

While escorting Soto out of the bank, an officer observed Soto make a head gesture to a woman inside a Chrysler in the bank parking lot. SA 85. A registration check revealed that the Chrysler had been purchased a few days earlier and was registered in the name of Gregory Bradley. SA 85.

At the police station, Soto made a phone call and was heard saying, "Don't show up at the police station with the Chrysler," and "Call Jeff—he'll know what to do with the cars." SA 85. Shortly afterwards, Yessica Amaro and Kim Litwin arrived at the station in the Chrysler. SA 85. The women said that the vehicle belonged to Gregory Bradley and that Bradley had purchased it a few days earlier. SA 85. The officers took possession of the vehicle, knowing it was falsely registered in Bradley's name because he had been incarcerated since August 2006. SA 85-86.

The police conducted an inventory search of the car and found documents regarding the purchase of three vehicles in Gregory Bradley's name in December 2006 and January 2007. SA 85-86. They also found a Gateway laptop computer and a document purporting to give Steven Soto power of attorney for Bradley. SA 86.

The police contacted the lawyer listed on the power of attorney, who confirmed that it was a forgery. SA 86. The police also visited the car

18

dealerships listed on the documents found in the Chrysler, where employees identified Soto as the individual who had claimed to be Gregory Bradley. SA 87. In addition, the police investigation expanded for the first time into potential fraud involving real estate. SA 346-47, 369. Investigators interviewed Jimma Shea on March 21, 2007. Dkt. 301, at 57-58.

### 5.    The March 2007 Search of the Laptop Computer

On March 30, 2007, Special Agent Everett, from the U.S. Secret Service, obtained a warrant to search the Gateway laptop computer found in the Chrysler. SA 120-31. The affidavit in support of the warrant discussed the investigation of Steven Soto prior to the 2006 search of the Soto residence (Aff. ¶ 5); information obtained in connection with the 2006 search (Aff. ¶¶ 6-10); the events surrounding Steven Soto's February 2007 arrest (Aff. ¶¶ 11-15); the February 2007 search of the Chrysler (Aff. ¶ 16); and the investigation following the arrest and vehicle search (Aff. ¶¶ 17-18). SA 121-27. The search of the laptop turned up, among other things, W-2 forms in the names of Carmen Soto and Gregory Bradley, pay stubs showing payments from Paradise Real Estate to Gregory Bradley, and a cable bill in Bradley's name. SA 86-87.

6.      The May 2007 Search of 56 Lawrence Road

On May 16, 2007, Agent Everett obtained a warrant to search, *inter alia*, the Soto residence at 56 Lawrence Road. SA 75-95. Like the prior affidavit in support of the warrant to search the Gateway computer, the affidavit supporting the warrant discussed the investigation of Steven Soto prior to the 2006 search of the Soto residence (Aff. ¶ 5); information obtained in connection with the 2006 search (Aff. ¶¶ 6-12); the events surrounding Steven Soto's February 2007 arrest (Aff. ¶¶ 13-17); the February 2007 search of the Chrysler (Aff. ¶ 18); and the investigation following the arrest and vehicle search (Aff. ¶¶ 19, 22). SA 78-86.

The affidavit also discussed new information the police had recently obtained. The affidavit discussed information obtained in the search of the Gateway computer (Aff. ¶ 21) and information regarding a website that depicted 56 Lawrence Road and advertised a raffle that purported to give away the home "mortgage free" (Aff. ¶ 25). SA 86-87, 89-90. The affidavit also stated that Steven and Pedro Soto had used Gregory Bradley's identity to purchase real estate and specifically mentioned 55 Lawrence Street and 399 Orange Street (Aff. ¶ 24). SA 88-89. The affidavit further alleged that while incarcerated in February and March 2007, Steven Soto had conversations with

20

his parents, who lived at 56 Lawrence Road, in which he mentioned criminal

activity (Aff. ¶ 26). SA 90.

### 7. Suppression of the Evidence Seized in the 2006 Search of 56 Lawrence Road in a Prior Case

Steven Soto was charged in a separate case with fraud and identity theft

in connection with the purchase of four motorcycles and three automobiles. *See*

*United States v. Soto*, 720 F.3d 51, 54 & n.2 (1st Cir. 2013). The district court in

that case (Hon. Joseph Tauro) granted Soto's motion to suppress the evidence

obtained in the 2006 search of the Soto residence. SA 113-18; *United States v.*

*Soto*, No. 07-10288-JLT, 2010 WL 2572879 (D. Mass. June 23, 2010). The

court concluded that the officer who had observed the stolen motorcycle

through the garage window at the Soto residence had entered the curtilage of

the residence and therefore had conducted an unconstitutional warrantless

search. SA 115-17. The court found that, absent the allegations about the

stolen motorcycle, the affidavit in support of the warrant to search 56

Lawrence Road failed to establish probable cause that evidence of Steven

Soto's criminal activity would be found inside the residence. SA 117.

### 8. Denial of the Suppression Motion in This Case

The defendants filed a motion to suppress in this case, arguing, as

relevant here, that the unconstitutional search of the Soto garage in 2006

required suppression of the evidence obtained in the 2007 searches of the Gateway computer and 56 Lawrence Road. SA 56-58, 63-67, 193-95. The district court denied the motion after a hearing. SA 422-41.[5]

The court concluded, without dispute by the government, that Steven Soto was "entitled to the collateral estoppel effect [of] Judge Tauro's decision." SA 425. The court determined, however, that the independent source doctrine precluded suppression. SA 425-40. The court first concluded that the police would have applied for the 2007 warrants even without the evidence obtained in the 2006 search of the Soto residence. SA 433, 436, 438. The court also concluded that the affidavits in support of the 2007 warrants established probable cause for the searches even when excised of the allegations that derived from the 2006 search of the Soto residence. SA 433-39.

## B.    Standard of Review

In reviewing the denial of a motion to suppress, legal conclusions, including probable cause determinations, are reviewed *de novo. See, e.g.*, *United States v. Tiru-Plaza*, 766 F.3d 111, 115 (1st Cir. 2014). Factual findings and credibility determinations are reviewed for clear error. *Id.* at 114-15. On clear

---

[5] A prior prosecution of the Sotos was dismissed on speedy trial grounds but prior to the dismissal, the district court (Hon. Richard Stearns) denied a similar suppression motion. *See* SA 161-87; *United States v. Soto*, 779 F. Supp. 2d 208 (D. Mass. 2011).

error review, the Court "grant[s] significant deference to the district court, overturning its [factual] findings only if, after a full review of the record, [the Court] possess[es] a definite and firm conviction that a mistake was made." *Id.* at 115 (internal citation and quotation marks omitted).

### C. The Independent Source Doctrine Precluded Suppression of the Evidence Seized from Soto's Computer and Residence

The exclusionary rule prohibits the introduction of evidence acquired during a search that violates the Fourth Amendment or that is acquired as an indirect result of the unlawful search. *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009). Even if there is a causal nexus between evidence and a Fourth Amendment violation, however, suppression is not appropriate if the government proves inevitable discovery, independent source, or attenuation. *United States v. Kornegay*, 410 F.3d 89, 93-94 & n.3 (1st Cir. 2005).

The independent source doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984); *see Murray v. United States*, 487 U.S. 533, 537-38 (1988). Where a search warrant was supported by an affidavit containing unlawfully-obtained information, the independent source doctrine precludes suppression if the government establishes two factors: (1) the police would have sought the warrant even if the unlawfully-obtained information

23

had never been acquired, and (2) the affidavit contains sufficient facts to support probable cause for the search even when excised of the unlawfully-obtained information. *Siciliano*, 578 F.3d at 68; *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005). The district court correctly found that the government satisfied this burden.

1.     The first prong of the independent-source doctrine, which asks whether police would have sought the warrant absent the unlawfully-obtained information, is "subjective," concerning "the police officers' intent." *Dessesaure*, 429 F.3d at 369; *see Siciliano*, 578 F.3d at 69. But proof of intent "should not be . . . by purely subjective means." *Dessesaure*, 429 F.3d at 369. The reviewing court must determine "the plausibility of the officers' 'assurances'" by "assess[ing] 'the totality of the attendant circumstances'" in light of how a "reasonable officer" would have acted in those circumstances. *Siciliano*, 578 F.3d at 69 (quoting *Dessesaure*, 429 F.3d at 369). A district court's finding on the first prong is a "factual finding subject to clear error review." *Id.*

The district court's finding with respect to the first prong was not clearly erroneous. Agent Everett testified that he would have sought the warrants even if he had not been aware of the information obtained through the 2006 search of the Soto residence. SA 362-65. The totality of the circumstances fully corroborated this testimony. Even before the unlawful search of the Soto

24

residence in 2006, the police had substantial evidence that Soto passed off counterfeit checks and used the identities of other individuals to purchase motorcycles. In fact, it was information that Eastern Bank had collected prior to the 2006 search of the Soto residence, namely the bank's March 2006 fraud alert, that caused employees of the bank to conclude, in February 2007, that Soto was posing as Gregory Bradley. The ensuing arrest of Soto revealed to the police new information that opened up entirely new avenues of investigation. Gregory Bradley's name came up for the first time in connection with the February 2007 arrest, along with evidence that Soto was using Bradley's identity to conduct financial transactions and purchase automobiles. It was also after the arrest that the police first began to investigate fraudulent real estate transactions by the Sotos. The police interviewed Jimma Shea, for example, in March 2007. All of these circumstances support the conclusion that the police would have applied for the 2007 warrants even if they had never acquired the information from the unlawful search of the Soto residence in 2006. The record does not support a "strong, unyielding belief" that the district court erred. *See Siciliano*, 578 F.3d at 72.

Soto contends that the 2007 warrants were the culmination of a year-long, "complex" investigation that grew out of the illegal search of the Soto residence in April 2006. Steven Br. 37-38. Although the police followed up on

25

and analyzed the information from the 2006 search in the ensuing months, it was the entirely new information that came out of Soto's February 2007 arrest that prompted the 2007 search warrants. To be sure, as Agent Everett candidly acknowledged, the information from the 2006 investigation was a factor he took into account in deciding to apply for the warrants in 2007. SA 371-72. But actual reliance on tainted evidence in seeking a search warrant does not make the independent source doctrine inapplicable as long as the record establishes—as it does here—that the warrants "would have been sought if what actually happened [*i.e.*, the unlawful search] had not occurred." *Siciliano*, 578 F.3d at 70 (internal citations and quotation marks omitted; alterations in original).

2.      The second prong of the independent-source doctrine requires that the "reviewing court . . . excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *Dessesaure*, 429 F.3d at 367. This inquiry is "wholly objective in its focus." *Id.* at 369; *see Siciliano*, 578 F.3d at 69. The court conducts this analysis "without engaging in consideration of the effect of the illegality on the . . . thought process" of the magistrate who actually approved the warrant. *Dessesaure*, 429 F.3d at 367.[6]

---

[6] Soto contends that the objective approach adopted in *Dessesaure*, and by other courts of appeals, is wrong and inconsistent with prior Supreme Court

This Court has left open whether the reviewing court should decide *de novo* whether the remaining allegations establish probable cause or apply a more deferential standard that asks whether the remaining allegations provide a substantial basis for concluding that the search would uncover evidence of wrongdoing. *Id.* at 368 n.8. Soto's claim fails under either standard.

An affidavit establishes probable cause to conduct a search when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit must "demonstrate[] in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Chiaradio*, 684 F.3d 265, 279 (1st Cir. 2012) (internal citation and quotation marks omitted).

Soto concedes that the affidavits here "unquestionably" established a fair probability that crimes had been committed. Steven Br. 47. According to Soto, however, the affidavits "fell far short" of establishing a likelihood that evidence of those crimes would be found in either the Gateway laptop computer or the

---

precedent, namely *Murray*, *supra*. Steven Br. 40-46. It is well established, however, that a panel of this Court is bound by a prior panel decision absent limited circumstances that are not present here, such as subsequent contrary authority from the Supreme Court or this Court en banc. *Sanchez v. United States*, 740 F.3d 47, 56 (1st Cir. 2014).

Soto residence at 56 Lawrence Road. Steven Br. 47-49. Soto's arguments lack merit.

The affidavit for the laptop search—excised of the offending information (Aff. ¶¶ 6-10)—established probable cause to believe that the computer was used to commit fraud and identity theft and that evidence of those crimes would be found on the computer. *See* SA 120-31 (affidavit). To begin with, the nature of the alleged criminal activity, relatively sophisticated identity fraud involving counterfeit documents, supported the inference that the computer was used in furtherance of that conduct. As Agent Everett alleged in the affidavit, "[b]ased on [his] training and experience and consultation with other agents," there was "probable cause to believe that the Gateway laptop . . . contain[ed] evidence such as documents pertaining to stolen identities and fraudulently obtained property and financial records relating to the execution of and proceeds from" Soto's fraudulent conduct. SA 128.

The circumstances surrounding the seizure of the computer buttressed Agent Everett's informed opinion. Soto brought the computer along with him when he went to Eastern Bank to commit crimes posing as Gregory Bradley, in a vehicle that he unlawfully obtained while posing as Bradley. *See* SA 124-28. The police found the computer inside the car, which Bradley instructed accomplices not to bring to the police department, along with a forged

28

document giving Soto power of attorney for Gregory Bradley and documents showing that Soto had used Bradley's identity to obtain the car and two other vehicles. These circumstances established at a minimum a fair probability that the computer, like the power of attorney, was an instrument of Soto's criminal activity and would contain additional evidence of that activity.

The affidavit for the search of 56 Lawrence Road, excised of information from the 2006 search (Aff. ¶¶ 6-12, and the second sentence of Aff. ¶ 26), likewise established a fair probability that evidence of criminal activity would be found in the house. *See* SA 77-95 (affidavit). The affidavit alleged that in Agent Everett's "experience and in the experience of other [Secret Service] agents, individuals engaged in fraud and identity theft keep at their residence records related to and used in their criminal activities." SA 90. It is well established "that a law enforcement officer's training and experience may yield insights that support a probable cause determination." *United States v. Floyd*, 740 F.3d 22, 35 (1st Cir. 2014); *see United States v. Felix*, 182 F.3d 82, 87-88 (1st Cir. 1999).

The affidavit established probable cause for the search even without the allegations based on Agent Everett's experience. The affidavit alleged that Carmen and Pedro Soto lived at that address along with Steven Soto and were involved in and aware of Steven Soto's criminal activity. The affidavit

specifically alleged the involvement of Pedro Soto, the owner of Paradise Real Estate, in a real estate transaction in which Gregory Bradley's identity was used to commit fraud. The affidavit alleged that a search of the Gateway laptop turned up pay stubs from Paradise Realty to Bradley. And the affidavit explained that police found a website that depicted 56 Lawrence Road as first prize for an unauthorized raffle, instructing purchasers of the $100 raffle tickets to mail payment to the address for Paradise Real Estate. All of these facts established a fair likelihood that evidence of criminal activity would be found in 56 Lawrence Road.

The district court correctly concluded that the affidavits established probable cause without the offending information. *See* SA 433-34, 436, 438-39. The court's denial of Steven Soto's suppression motion should be affirmed.

## II. The District Court Did Not Abuse Its Discretion in Excluding Excerpts From the GAO Report

The defendants contend that the district court erred in excluding from evidence excerpts from a 2009 report authored by the Government Accountability Office (GAO). *See* Carmen Br. 9-14; Pedro Br. 38-48; Steven Br. 49-50. This argument lacks merit.

30

## A.    Background

Carmen Soto sought the admission of excerpts from a GAO report regarding "the recent financial crisis." CA 434. The report, dated January 8, 2009, stated that "nonbank lenders" had in recent years come to "represent a large share of the consumer lending market, including for subprime mortgages," and they "were generally not subject to the same routine monitoring and oversight by federal agencies that their bank counterparts were." CA 434-35. According to the report, "[t]he significant participation by these nonbank lenders in the subprime mortgage market—which targeted products with riskier features to borrowers with limited or poor credit history— contributed to a dramatic loosening in underwriting standards leading up to the crisis." CA 434. Soto argued that the report supported her defense theory that the mortgage lenders tacitly approved or condoned her conduct. *See* Dkt. 298, at 15; Dkt. 308, at 6-8; Dkt. 317, at 174-85, 193-96; Dkt. 318, at 152-55.

The district court excluded the report. Dkt. 317, at 175-76; Dkt. 318, at 5-7, 124. The court assumed without finding that the GAO report was an admissible public record under Federal Rule of Evidence 803(8). Dkt. 318, at 6. The court nonetheless excluded the report under Federal Rule of Evidence 403. *See* Dkt. 317, at 175-76; Dkt. 318, at 5-7. The court also rejected Carmen

31

Soto's contention that exclusion of the report violated her Sixth Amendment right to present a defense. Dkt. 318, at 152-55.

### B.    Standard of Review

A trial court's decision to exclude evidence under Rule 403 is reviewed for abuse of discretion. *United States v. Pires*, 642 F.3d 1, 10 (1st Cir. 2011); *United States v. Anthony*, 545 F.3d 60, 66 (1st Cir. 2008). This Court will "[o]nly rarely and in extraordinarily compelling circumstances" reverse a district court's "on-the-spot judgment concerning the relative weighing of probative value and unfair effect" on the basis of a "cold appellate record." *United States v. Vizcarrondo-Casanova*, 763 F.3d 89, 94 (1st Cir. 2014) (internal citation and quotation marks omitted).

Unpreserved Rule 403 claims are reviewed for plain error. *United States v. Wallace*, 461 F.3d 15, 28 (1st Cir. 2006). To establish plain error, the defendant must show (1) "an error occurred," (2) that was "clear or obvious and which not only (3) affected [the defendant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Flemmi*, 402 F.3d 79, 86 (1st Cir. 2005).

Carmen Soto sought to introduce the GAO report at trial and therefore her claim of error should be reviewed for an abuse of discretion. *See* Fed. R. Evid. 103(a)(2). Pedro and Steven Soto did not join Carmen's efforts or

32

otherwise seek admission of the GAO report, however, and their claims of evidentiary error should therefore be reviewed for plain error. *Cf. United States v. Vazquez-Botet*, 532 F.3d 37, 54 n.12 (1st Cir. 2008) (defendant's objection to vouching during closing argument did not preserve claim for codefendant); *but see United States v. Irving*, 665 F.3d 1184, 1206-07 (10th Cir. 2011) (noting conflicting views with respect to whether a defendant may vicariously preserve a claim of evidentiary error on behalf of a codefendant). Carmen Soto's objection would have preserved the claim for Pedro and Steven Soto had the district court specifically stated that an objection by one defendant would be considered an objection for all, *see United States v. Alzanki*, 54 F.3d 994, 1006 n.11 (1st Cir. 1995); *United States v. Sepulveda*, 15 F.3d 1161, 1180 (1st Cir. 1993), but it does not appear that the court announced such a rule.

### C.    Argument

The district court did not abuse its discretion in excluding the GAO report under Federal Rule of Evidence 403. To the contrary, the court's reasoning was cogent and correct.

As the district court concluded, the report had little if any relevance to the defendants' theory of defense. Dkt. 317, at 175; Dkt. 318, at 6-7. The condonation defense theory "focuse[d] on . . . the particular lender's knowledge of and tacit approval of false statements made in an effort to get a

loan." Dkt. 318, at 5-6. The GAO report, however, did not speak to "the practices of particular lenders involved in this case." Dkt. 317, at 175; *see* Dkt. 318, at 6. The report's reference to a "dramatic loosening of underwriting standards" was so vague and ambiguous that it had little probative value. *See* Dkt. 317, at 182. And even if it is assumed that the reference tended to support the contention that the lenders in this case lowered their underwriting standards, and made "themselves susceptible to fraud," it did not establish that the lenders knowingly provided loans on the basis of false information and "condon[ed] fraud." Dkt. 317, at 182; *see* Dkt. 317, at 183-84.

The GAO report also was not relevant to materiality. Materiality "is an objective test," Dkt. 318, at 7; *see* Dkt. 317, at 175-76, that asks whether information would have "a natural tendency to influence" or the "capab[ility] of influencing" a decisionmaker. *Neder v. United States*, 527 U.S. 1, 16 (1999). As the court concluded, however, the report did not discuss "the practices of reasonable lenders," Dkt. 317, at 175, or otherwise speak to what information would influence a lender in deciding whether to approve a mortgage.

The admission of a government report that discussed in general terms the conditions during the financial crisis would have been much more likely to confuse than enlighten the jury. As the district court concluded, there was a risk that the report would confuse the issues and cause the jury to

34

misunderstand the jury instructions. Dkt. 318, at 6-7. The district court acted well within its discretion in excluding the report.

The exclusion of the report also did not infringe on the defendants' constitutional right to a fair trial or to present a defense. "[T]he right to present a defense does not trump valid rules of evidence." *Pires*, 642 F.3d at 13; *accord United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014); *United States v. Diaz*, 670 F.3d 332, 345-46 (1st Cir. 2012). A defendant's fair-trial rights are not violated where, as here, a district court excludes evidence after carefully weighing the competing interests identified in Federal Rule of Evidence 403. *United States v. Brown*, 500 F.3d 48, 57-58 (1st Cir. 2007).

Even assuming the district court abused its discretion in excluding the excerpts from the GAO report, the error was harmless beyond a reasonable doubt. *See, e.g.*, *United States v. Adams*, 375 F.3d 108, 113 (1st Cir. 2004) (Rule 403 error deemed harmless); *George*, 761 F.3d at 56-57 (constitutional error deemed harmless). There is no reasonable likelihood that the outcome of the trial would have been different had the jury been provided with the report's ambiguous generalizations about "underwriting standards leading up to the crisis." CA 434.

35

**III.    The District Court Did Not Commit Plain Error by Failing to *Sua Sponte* Strike the Testimony of Jimma Shea**

Pedro Soto contends that testimony by witness Jimma Shea requires a new trial. Pedro Br. 14-24. His arguments lack merit.

**A.    Background**

The government called Shea as a witness at trial. PA 95-96. As relevant here, she testified that Steven Soto posed as Gregory Bradley and visited her to obtain her signature on documents that would allow Soto to sell the units in 55 Lawrence Street as three separate condominiums. Dkt. 313, at 117-18, 120-21, 130-33, 135. Shea refused to sign the documents and surreptitiously recorded part of her conversation with Soto. Dkt. 313, at 123-25, 128-29.

The recording was admitted into evidence and played for the jury during Shea's direct testimony. *See* Dkt. 314, at 8-24, 25-31, 34-35. On the recording, Steven Soto can be heard saying, among other things, that Shea's refusal to sign the documents would likely result in a federal law enforcement investigation, to which Shea responded, "They will find out the truth." Dkt. 314, at 30-31; *see* Ex. 78. When asked to explain what she meant by that statement, Shea testified that she felt Pedro and Steven Soto "were tricking" here. Dkt. 314, at 31. Shea testified that she had put her "trust in Pedro to sell

my house" but "they were trying to steal my house from me and sell it and keep the money for themselves." Dkt. 314, at 31.

On cross-examination, counsel for Steven Soto asked Shea if she had received a phone message from John Briggs—a lawyer with whom Shea had consulted—in which Briggs explained the lease-with-option-to-purchase agreement with Bradley. PA 114; *see* Dkt. 314, at 63, 66. Shea did not directly respond to the question. PA 114. Defense counsel interjected, but Shea continued her answer, testifying that Briggs had told her that Pedro was "not an honest person" and that is "why I refused to sign the paper." PA 114-15. Defense counsel instructed Shea to listen to his specific question, regarding the phone message from Briggs. PA 115. Shea again did not directly respond, saying "I don't trust him," which caused the district court to interject and give this instruction: "Listen to the question. Say what is necessary to answer that question. Don't say anything else." PA 115.

## B.    Standard of Review

Pedro Soto did not object to the allegedly improper testimony by Shea. This Court should therefore review for plain error. *See, e.g.*, *United States v. Rodriguez*, 525 F.3d 85, 95 (1st Cir. 2008). Soto contends that the district court's interjection during Shea's cross-examination preserved a claim of error. Pedro Br. 16-17. The plain language of Federal Rule of Evidence 103 provides,

however, that "*a party* may claim error" in a ruling to admit evidence if "*a party* . . . timely objects or moves to strike." Fed. R. Evid. 103(a)(1)(A) (emphases added). Moreover, to preserve a claim of error, an objection must "state[] the specific ground" for excluding the evidence unless the ground "was apparent from the context." Fed. R. Evid. 103(a)(1)(B). The district court's interjection did not serve that function. The court merely directed that Shea answer defense counsel's specific question, an exercise of its supervisory control over the mode of witness testimony. *See* Fed. R. Evid. 611(a).

Soto contends that an objection by defense counsel "would have served no purpose." Pedro Br. 16. If that were the case, and the court's interjection were deemed the equivalent of a sustained objection, Soto would have no plausible claim of error, plain or otherwise. A district court "generally has no obligation to caution a jury to disregard every improper statement made by a witness when it has sustained an objection to that statement." *United States v. Casas*, 356 F.3d 104, 114 (1st Cir. 2004).

### C.    Argument

Soto does not identify plain error that should have prompted the district court to strike Shea's testimony absent a defense objection. Soto suggests that the testimony was (1) "prejudicial character evidence," Pedro Br. 18-19; (2) improper lay opinion testimony about his truthfulness, Pedro Br. 18-20, or (3)

inadmissible hearsay. Pedro Br. 20-21. These arguments do not stand up to scrutiny.

The allegedly erroneous testimony by Shea—that she felt Pedro and Steven Soto were "tricking" her and "trying to steal [her] house," and that her attorney told her Pedro Soto was "not an honest person"—was not character evidence prohibited by Federal Rule of Evidence 404(a). The context of this testimony shows it was not offered to establish that Soto was a deceitful person and that he "acted in accordance with [that] character or trait." Fed. R. Evid. 404(a)(1). Rather, the testimony revealed Shea's state of mind at the time Steven Soto urged her to sign the papers and explained why she refused to sign the papers. According to Shea, for example, Briggs told her that Soto was "not an honest person," and that is "why [she] refused to sign the paper." PA 115. This testimony was not offered to prove the truth of Briggs's out-of-court statement that Soto was dishonest. The testimony therefore did not run afoul of Rule 404 or the rules against hearsay. *See* Fed. R. Evid. 801, 802.[7]

Shea's testimony was also not improper lay opinion testimony. In explaining her statements to Steven Soto during a recorded conversation, Shea

---

[7] In addition, this testimony came out during cross-examination by counsel for Steven Soto, and defense counsel plainly did not offer the statement to prove that Pedro Soto was in fact dishonest. *See* Fed. R. Evid. 801(c)(2) (defining "hearsay" as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement").

testified that at the time of the conversation she subjectively believed that Pedro and Steven Soto were tricking her. To the extent Shea arguably provided an "opinion" for purposes of Federal Rule Evidence 701, her testimony was permissible because it was "(1) rationally based on [her] perception; (2) helpful to understanding [her] testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. It is not clear or obvious that Shea's testimony was prohibited in the circumstances of this case. *Cf. United States v. Oslund*, 453 F.3d 1048, 1058 (8th Cir. 2006) (no plain error in lay opinion testimony about veracity of defendant's statement based on witness's personal perceptions as a participant in the conversation).

Pedro Soto also cannot show that the evidentiary error affected his substantial rights—*i.e.*, that the alleged error probably affected the outcome of the trial, *see United States v. Lopez Garcia*, 672 F.3d 58, 63 (1st Cir. 2012)—or that it undermined the integrity of judicial proceedings. There was strong evidence admitted at trial that Soto acted dishonestly and deceitfully in the specific context of the schemes to procure loans based on false pretenses. Among other things, the evidence showed that he engineered an agreement between Shea and his son posing as Gregory Bradley. The evidence also established that he recruited, and to a certain extent manipulated, Pamela

40

Landess to serve as a straw buyer. There is no realistic probability that the fleeting reference to Soto's dishonesty during Shea's testimony affected the outcome of the three-week trial. Soto's claim of evidentiary error lacks merit.[8]

### IV. The Defendants Waived a Claim of Error In the District Court's Good Faith Instructions But, Even if Forfeited, Their Claim Fails

The defendants contend that the jury instructions on good faith were erroneous. Carmen Br. 14-20; Pedro Br. 25-33; Steven Br. 50. The defendants waived this claim, but even if they forfeited the claim, it fails on plain error review.

#### A. Background

1. As noted above, *see supra* pp. 11-12, the defendants advanced a defense theory that they lacked the intent to defraud because the mortgage lenders were aware of and tacitly approved their conduct. They accordingly asked for a jury instruction entitled "Good Faith Defense—Explained" stating that "[t]he good faith of Defendants is a complete defense to the" charges of mail fraud. Dkt. 83, at 19. They also requested an instruction entitled "Condonation/Intent to Defraud," modeled on *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996), that explained the defense theory that "because the lenders knew of and condoned the activities in question, [the defendants] did

---

[8] For the same reasons, even if the claim is deemed preserved, it must be found harmless.

not possess the required specific intent to commit the offenses with which they are charged." Dkt. 83, at 20.

2.    The district court concluded that there was sufficient evidence to support a theory of defense instruction on good faith and "condonation." Dkt. 317, at 175, 185; Dkt. 318, at 6-7. The court specifically referred to testimony by Pamela Landess that "she told the closing attorney . . . that this wasn't going to be her primary residence and the loan closed anyway." Dkt. 317, at 175; *see* Dkt. 318, at 6, 138. The court therefore drafted a proposed "good faith" and "condonation" charge and disclosed it to the parties the day before closing arguments to give the parties an opportunity to be heard. Dkt. 318, at 129; *see* Dkt. 318, at 128-41.

The court proposed to instruct the jury that "[t]o act with intent to defraud means to act with intent to deceive someone in order to obtain money or property," and "[s]ince an essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail fraud." Dkt. 318, at 139. The court based this portion of the instructions largely on the defendants' proposed jury instructions, Dkt. 318, at 139, but the court also added additional language, specifically: "In considering whether or not a defendant acted in good faith, you are instructed that any belief by a defendant that ultimately everything

42

would work out so that no one would lose any money does not require a finding by you that he or she acted in good faith," and "[n]o amount of honest belief on the part of the defendant that the alleged scheme would ultimately benefit the people and/or institutions involved will excuse fraudulent actions or . . . material . . . false representations by a defendant to obtain money." Dkt. 318, at 139-40.

The court also proposed to instruct the jury that "[e]ach defendant contends that each of the mortgage lenders involved in this case knew of and condoned the activities in question and therefore that he or she did not possess the required intent to commit the crimes of mail fraud with which he or she is charged." Dkt. 318, at 140. According to the draft instructions, "[t]he mortgage lenders' knowledge or tacit approval of the commission of an offense does not by itself constitute a defense or an excuse for the crime of mail fraud," but "any evidence that a mortgage lender knew of the allegedly fraudulent scheme or of an alleged material false statement and nevertheless granted a requested loan, may be considered by you [the jury] on the issue of whether the government has proven that a defendant had the intent to defraud necessary to have committed the alleged mail fraud at issue." Dkt. 318, at 140.

3.      The court asked the parties if they had "any reaction to that instruction." Dkt. 318, at 141. Counsel for Carmen Soto responded "[n]ot

43

from me." Dkt. 318, at 141. No other defendant made a comment or interposed an objection. Dkt. 318, at 141. The court then said, "I think [the instruction is] essentially what you're looking for. It's not word for word [*Josleyn*, *supra*], but it's close. Okay?" Dkt. 318, at 141. Again, none of the defendants interposed an objection. Dkt. 318, at 141.

The next day the district court instructed the jury consistent with the draft instructions reviewed with the parties. Dkt. 319, at 154-56. Counsel for Carmen and Steven Soto referred explicitly to these instructions during closing arguments. Dkt. 319, at 67-68, 104-05. Counsel for Steven Soto argued, for example, that evidence of tacit approval by the lenders was something the jury could "use and assess with respect to these defendants and whether they had the sufficient intent to defraud the lenders in this case." Dkt. 319, at 67-68. Carmen Soto's counsel urged the jury to "listen to the judge's instructions very carefully particularly when he gets to the part about good faith because that's going to tell you what you need to know when you decide this case." Dkt. 319, at 104. According to counsel, "from Carmen Soto's perspective, risk assessment equals [condonation], risk assessment equals tacit approval by the lender." Dkt. 319, at 104. None of the defendants objected to the instructions on good faith and "condonation."

44

### B.     Standard of Review

As discussed below, the claims of instructional error advanced by the defendants were waived, but if not waived the claims were forfeited and reviewable only for plain error. *See, e.g.*, *United States v. Medina-Martinez*, 396 F.3d 1, 8 (1st Cir. 2005). This Court has warned that "the hurdle of plain error 'nowhere looms larger than in the context of alleged instructional errors.'" *United States v. Newell*, 658 F.3d 1, 28 (1st Cir. 2011) (quoting *United States v. Paniagua-Ramos*, 251 F.3d 242, 246 (1st Cir. 2001)). The Court "look[s] at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury." *United States v. Brown*, 669 F.3d 10, 29 (1st Cir. 2012) (internal citation and quotation marks omitted). "While reversal of a conviction predicated on unpreserved instructional error is theoretically possible," it is "'the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.'" *United States v. Weston*, 960 F.2d 212, 216 (1st Cir. 1992) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

### C.     The Defendants Waived Their Challenge to the Good Faith Instructions

Waiver is "the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v.*

*Zerbst*, 304 U.S. 458, 464 (1938)). Waiver differs from forfeiture, which is the "failure to make the timely assertion of a right." *Id.* Whereas forfeiture allows for plain error review under Federal Rule of Criminal Procedure 52(b), waiver precludes appellate review. *Id.*; *see United States v. Medina*, 427 F.3d 88, 91 & n.1 (1st Cir. 2005); *United States v. Mitchell*, 85 F.3d 800, 807 (1st Cir. 1996).

The defendants' claim of error in the jury instructions on good faith was waived, not forfeited. The defendants requested good faith and condonation instructions, *see* Dkt. 83, at 19-20, and assented to the instructions drafted by the district court based in part on their proposed instructions, *see* Dkt. 317, at 175, 185; Dkt. 318, at 6-7, 128-41. The defendants were given an opportunity to comment on the instructions but raised no objections and did not dispute the court's assertion that the instructions were "essentially what [the defendants were] looking for." Dkt. 318, at 141. To the contrary, the defendants emphasized these instructions during closing arguments and urged the jury to acquit on the basis of the instructions. Dkt. 319, at 67-68, 104-05. In light of these circumstances, the defendants relinquished or abandoned any claim of legal error in the instructions. *Compare United States v. Rojo-Alvarez*, 944 F.2d 959, 971 (1st Cir. 1991) (waiver of claimed error in jury instruction); *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011); *and United States v. Lakich*, 23 F.3d 1203, 1207-08 (7th Cir. 1994); *with United States v. Marder*, 48

46

F.3d 564, 570-71 (1st Cir. 1995) (no waiver of error in jury instructions where circumstances deemed "a far cry from" *Lakich*).

### D. The Defendants' Challenge to the Good Faith Instructions Fails Even if Reviewed for Plain Error

An "intent to defraud" means an intent to deceive another in order to deprive another of money or property. *United States v. LaPlante*, 714 F.3d 641, 644-46 (1st Cir. 2013); *see United States v. Kenrick*, 221 F.3d 19, 26–27 (1st Cir. 2000) (en banc) (discussing parallel language in bank fraud statute, 18 U.S.C. § 1344), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014). An intent to defraud "excludes false statements honestly believed to be true and promises or predictions made in good faith." *United States v. Mueffelman*, 470 F.3d 33, 36 (1st Cir. 2006). A defendant who intentionally deceives another to obtain money acts with the requisite intent, however, even if he "believe[s] that his enterprise [will] succeed," *id.* at 37, or that the victim will later be repaid, *see United States v. Spink*, 503 F.3d 619, 621-22 (7th Cir. 2007); *United States v. DeRosier*, 501 F.3d 888, 893-94 (8th Cir. 2007); *United States v. Allen*, 491 F.3d 178, 186 (4th Cir. 2007). "A prediction made in good faith may be sheltered; a statement of fact known to be false is not." *Mueffelman*, 470 F.3d at 37.

For example, "[s]omeone who obtains a loan from a bank by representing that his income is $1 million a year, when actually he earns only $100,000 annually, has committed fraud even though he sincerely believes that he can repay," "indeed, even if [he] actually repays." *Spink*, 503 F.3d at 621-22. "The law requires people to tell the truth," so that their counterparties—in this case, the mortgage lenders—"may decide for themselves which investments to make and which goods to buy or sell." *Id.* at 622. Those who "want to raise money cannot obtain it by deceit and then try to persuade a jury that their intentions were good." *Id.* Sanctioning "a license to lie with a 'good heart'" would expose lenders "to far too much risk and deny them the option of making intelligent and autonomous choices on their own behalf." *Id.*

The district court's instructions correctly conveyed these principles. The court explained that "[t]o act with 'intent to defraud' means to act with intent to deceive someone in order to obtain money or property." Dkt. 319, at 154-55. The jury was instructed that good faith is a complete defense to mail fraud and, in considering whether the defendants acted in good faith, the jury could consider "any evidence that a mortgage lender knew of the allegedly fraudulent scheme or of an alleged material false statement and nevertheless granted a requested loan." Dkt. 319, at 155-56. It was correct to also instruct the jury that a belief by a defendant that "ultimately everything would work out" or that

48

"no one would lose money" does not compel a finding of good faith. Dkt. 319,
at 155. The defendants cannot demonstrate error in these instructions, much
less clear or obvious error.

The defendants contend that, in light of *United States v. Rossomando*, 144
F.3d 197 (2d Cir. 1998), it was error to instruct the jury that a defendant's
belief that "ultimately everything would work out" or that "no one would lose
money" does not require a finding of good faith and that "[n]o amount of
honest belief on the part of a defendant that the alleged scheme will ultimately
benefit the individuals or institutions involved will excuse fraudulent actions or
material false representations by a defendant to obtain money or property."
Dkt. 319, at 155; *see* Carmen Br. 15-19; Pedro Br. 27-33. In *Rossomando*, the
Second Circuit concluded that this instruction, which the court referred to as a
"no ultimate harm" instruction, was "at odds with the requirement that a
defendant must have intended to harm his victim in order to be guilty of mail
fraud." *Rossomando*, 144 F.3d at 201.

The defendants' reliance on *Rossomando* is misplaced. This Court has
concluded that no intent to harm is required to establish an intent to defraud.
*Compare Kenrick*, 221 F.3d at 27 (explaining that the "language [of the
analogous bank fraud statute] boils down to a prohibition on schemes to obtain
money or other property . . . by specified means of deception" and that

49

"[n]othing in the language . . . indicates that 'intent to harm' is required"), *with United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991) (contemplated harm to victim is required element of mail fraud). That conclusion is correct but, in any event, precludes a finding of clear or obvious error in the district court's jury instructions. *See United States v. Valdivia*, 680 F.3d 33, 42 (1st Cir. 2012) (no clear or obvious error in light of lack of consensus among circuits).[9]

Even under Second Circuit precedent there was no error in the jury instructions, let alone clear or obvious error. That court has concluded that *Rossomando* is "'limited to the quite peculiar facts that compelled its result.'" *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (quoting *United States v. Gole*, 158 F.3d 166, 169 (2d Cir. 1998) (Jacobs, J., concurring)). The defendant in *Rossomando* was a disabled worker who falsely reported that his annual earnings were below an amount that automatically triggered reductions in his pension payments, and his defense at trial was that he believed the

---

[9] The other courts of appeals are largely in agreement with this Court's view. *See, e.g., United States v. Hickey*, 580 F.3d 922, 930-931 (9th Cir. 2009); *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003); *United States v. Judd*, 889 F.2d 1410, 1414 (5th Cir. 1989); *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987). The mail fraud statute makes no mention of contemplated harm, and nothing in the statutory text or Supreme Court precedent requires engrafting a separate "intent to harm" element onto the already-existing requirement of fraudulent (*i.e.*, deceptive) intent to obtain money or property. *See, e.g., McNally v. United States*, 483 U.S. 350, 358 (1987) (defining a "scheme to defraud" as "usually signify[ing] the deprivation of something of value by trick, deceit, chicane or overreaching").

threshold amount of earnings that triggered automatic reductions was well
above what he reported. 144 F.3d at 198. The court explicitly distinguished
circumstances in which "a defendant deliberately supplies false information to
obtain a bank loan, but plans to pay back the loan and therefore believes that
no harm will 'ultimately' accrue to the bank." *Id.* at 201. In those
circumstances, "the defendant's good-faith intention to pay back the loan is no
defense because he intended to inflict a genuine harm upon the bank," namely
"depriv[ing] the bank of the ability to determine the actual level of credit risk
and to determine for itself on the basis of accurate information whether, and at
what price, to extend credit to the defendant." *Id.* Thus, the narrow holding of
*Rossomando* is that "a defendant's belief that information is immaterial to a
disbursement decision amounts to a defense to mail fraud *only if the
disbursement is mechanical as opposed to discretionary*." *Gole*, 158 F.3d at 169
(Jacobs, J., concurring) (emphasis added). The Second Circuit accordingly has
distinguished *Rossomando* on a number of occasions and approved "no ultimate
harm" instructions.[10]

---

[10] *Ferguson*, 676 F.3d at 280; *United States v. Leonard*, 529 F.3d 83, 91-92
(2d Cir. 2008); *United States v. Koh*, 199 F.3d 632, 641 (2d Cir. 1999); *United
States v. Berkovich*, 168 F.3d 64, 65 (2d Cir. 1999); *United States v. Ingram*, 490
Fed. Appx. 363, 366-67 (2d Cir. 2012) (unpublished); *United States v. Cartelli*,
272 Fed. Appx. 66, 69 (2d Cir. 2008) (unpublished); *United States v. Marzo*, 312
Fed. Appx. 356, 358-59 (2d Cir. 2008) (unpublished); *United States v. Levis*, 488

The limited holding of *Rossomando* is therefore inapposite here. The defense argued that the lenders had lax underwriting standards and had a desire to make as many loans as possible, as long as they were secured by adequate collateral. *See* Dkt. 319, at 66-79, 88-90 99-108. The defendants in effect argued that it was their belief that ultimately everything would work out for the lenders despite the false information they provided because the lenders would have wanted to make the loans even had they had been aware of the false information. Under the reasoning of *Rossomando*, however, the defendants lacked good faith if they intended to deprive the lenders of the "full information" they needed to "make refined, discretionary judgments." 144 F.3d at 201 n.5. Thus, even under Second Circuit law, there was a sufficient factual predicate in this case for a "no ultimate harm" instruction. *See, e.g.*, *Ferguson*, 676 F.3d at 280; *Leonard*, 529 F.3d at 91-92.

Pedro Soto contends that as to him specifically there was an insufficient factual predicate for the "no ultimate harm" instruction. Pedro Br. 28-30. To the contrary, Soto joined in the request for good faith and "condonation" jury instructions. Dkt. 83, at 1, 19-20, 22. He did not object to the court's instruction that "[e]ach defendant contends that each of the mortgage lenders

---

Fed. Appx. 481, 486 (2d Cir. 2012) (unpublished); *United States v. Rybicki*, 38 Fed. Appx. 626, 632 (2d Cir. 2002) (unpublished).

involved in this case knew of and condoned the activities in question." Dkt. 319, at 156; *see* Dkt. 319, at 155 (instructing that "[i]n this case . . . the defendants argue that the mortgage lenders each knew of and condoned" their conduct). And in closing arguments he discussed "the environment in 2006" and the testimony that "closing is king." Dkt. 319, at 89-90. According to Soto, "[e]veryone got a mortgage" and "banks and lenders were giving 100 percent financing to people who are not creditworthy," "[s]o these lenders invited risky loans and they invited risky loans because they got better money, they got better profit." Dkt. 319, at 89-90. In other words, he suggested that his conduct in providing false information to procure loans did not harm the lenders because they wanted to make risky loans. Under Second Circuit law, the "no ultimate harm" instruction was appropriate in light of Soto's defense.

Even assuming *arguendo* that there was clear or obvious error in the district court's instructions, the defendants cannot show that the alleged error affected their substantial rights. The evidence that the defendants intended to defraud the lenders, *i.e.*, intended to deceive the lenders in order to deprive them of money or property, was overwhelming. The evidence at trial established that the ultimate object of the defendants' deception—in finding straw buyers and arranging for them to obtain loans on the basis of false information—was to obtain money from the lenders. After the sale, the

properties went into default and the lenders were left with the properties, but the Sotos kept the money, or at least a portion of it. Even if the Sotos believed that the lenders would be no worse off when left with the collateral, they still deprived the lenders of the loaned money, not to mention the ability to decide on the basis of accurate information whether to make the loans and on what terms. There is no reasonable probability that the outcome of the trial would have been different had the district court omitted the "no ultimate harm" instruction.

## V.    There Was No Plain Error in the District Court's Reasonable Doubt Instructions

Pedro Soto contends that the district court's reasonable doubt instructions were erroneous. Pedro Br. 33-37. His argument does not withstand scrutiny.

### A.    Background

The district court provided extensive instructions on reasonable doubt. Dkt. 319, at 133-35. The court explained that "the burden is on the government to prove beyond a reasonable doubt a defendant is guilty of the charge made against him or made against her." Dkt. 319, at 133. "Reasonable doubt exists when, after weighing and considering all the evidence, using reason and common sense, jurors cannot say that they have a settled

54

conviction of the truth of the charge." Dkt. 319, at 134. The court explained that "a defendant is never to be convicted on suspicion or guesswork." Dkt. 319, at 134. "If, for example, you view the evidence in the case as reasonably permitting either of two conclusions," the court instructed, "one that a defendant is guilty as charged, the other that the defendant was not guilty, you will find the defendant not guilty." Dkt. 319, at 134. The court emphasized that proof beyond a reasonable doubt is a "strict" and "heavy burden." Dkt. 319, at 134-35. It is not enough for the government "to establish a probability, though a strong one, that an element of an offense charged, a fact necessary to prove an offense charged, is more likely to be true than not true." Dkt. 319, at 134. "On the other hand," the court explained, "there are very few things in this world that we know with absolute certainty and in criminal cases the law does not require proof that overcomes every possible doubt." Dkt. 319, at 134-35.

**B.    Standard of Review**

Neither Pedro Soto nor any other defendant objected to the district court's reasonable doubt instructions. As a result, as Soto seems to concede, *see* Pedro Br. 33, 36-37, review is for plain error, *see United States v. Jones*, 674 F.3d 88, 93-94 (1st Cir. 2012).

### C.    Argument

The instructions on reasonable doubt the district court provided here were approved by this Court in *United States v. Cleveland*, 106 F.3d 1056, 1062-63 (1st Cir. 1997), *aff'd sub nom. Muscarello v. United States*, 524 U.S. 125 (1998). The instructions in this case and in *Cleveland* are almost indistinguishable. *Compare* Dkt. 319, at 133-35, *with Cleveland*, 106 F.3d at 1062-63. This Court concluded that those instructions "correctly convey[] the concept of reasonable doubt." *Id.* at 1063. Soto accordingly cannot establish error in the jury instructions, let alone clear or obvious error.

Soto challenges the portion of the instructions stating that "[i]f . . . you view the evidence in the case as reasonably permitting either of two conclusions, one that a defendant is guilty as charged, the other that the defendant was not guilty, you will find the defendant not guilty." Dkt. 319, at 134; *see* Pedro Br. 33-36. According to Soto, "[t]his charge is disfavored because it could mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt." Pedro Br. 34. The jury instructions in the cases cited by Soto, however, use the terms "guilt" and "innocence" and instruct the jury to "adopt the conclusion of innocence" if the evidence permits either finding. *See, e.g.*, *United States v. Dowlin*, 408 F.3d 647, 665-67 & n.9 (10th Cir. 2005). This Court has found "less troublesome"

instructions, like the instructions in this case, that "refer[] to guilt and non-guilt, rather than innocence, a term less susceptible to a lay response." *United States v. Ranney*, 298 F.3d 74, 79 (1st Cir. 2002); *see United States v. O'Shea*, 426 F.3d 475, 482-83 (1st Cir. 2005).

It is true that this Court has cautioned that "telling jurors that the question is one of guilt or non-guilt, without more, could risk undercutting the government's burden by suggesting that the defendant is guilty if they do not think he is not guilty." *Ranney*, 298 F.3d at 79-80. But the Court has upheld instructions containing this language if there is no reasonable likelihood that the jury misunderstood the government's burden in light of the charge in its entirety. *Id.* at 80 (rejecting preserved claim of error in reasonable doubt instruction); *O'Shea*, 426 F.3d at 482-83 (rejecting claim of deficient reasonable doubt instruction on plain error review). The instructions in this case referred to the government's burden of proof "beyond a reasonable doubt" 16 times. Dkt. 319, at 131, 132, 133, 135, 149, 150, 152, 154, 156, 157, 160. The parties themselves also referred to that burden 12 times during their respective closing arguments. Dkt. 319, at 27, 34, 45, 47, 54, 57, 60, 88, 98. Considered in their entirety, the district court's instructions on reasonable doubt—which are very similar, if not almost identical, to the instructions upheld in *Cleveland*, *Ranney*,

57

and *O'Shea*—correctly conveyed the government's burden. There was no error in the instructions, plain or otherwise.

## VI. Ample Evidence Supported the Mailing Element of Steven Soto's Mail Fraud Convictions

Steven Soto contends that the evidence was insufficient to establish the use-of-the-mails element of the mail fraud charges. Steven *Pro Se* Br 8-10. His argument lacks merit.

### A. Standard of Review

The district court reserved ruling on the motion for judgment of acquittal filed by the defendants after the government rested its case, Dkt. 318, at 85, and denied the motion after the jury returned its verdict, Dkt. 320, at 13; *see* Dkt. 178 (defendants' Rule 29 motion). This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. *United States v. Marston*, 694 F.3d 131, 134 (1st Cir. 2012). The Court "examine[s] the evidence in the light most favorable to the verdict and need only conclude that the evidence would permit a rational fact-finder to conclude beyond a reasonable doubt that defendant committed the charged crime." *United States v. Harris*, 660 F.3d 47, 53 (1st Cir. 2011).

### B.    Argument

In order to prove the mail fraud charges against Soto, the government had to prove, among other things, "the use of interstate mail . . . communications in furtherance of" a scheme to defraud. *Cheal*, 389 F.3d at 41. This "mailing element" requires proof that (a) the defendant "cause[d] the use of the mails," and (b) the use of the mails was "in furtherance" of the scheme to defraud. *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008) (emphasis omitted); *see United States v. McCann*, 366 F.3d 46, 52 (1st Cir. 2004), *vacated on other grounds*, 543 U.S. 1104 (2005).

The first part of the standard is satisfied if the defendant performs "some act from which it is reasonably foreseeable that the mails will be used." *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004) (internal citation and quotation  marks omitted). The defendant need not have "personally executed the mailings." *Id.* (internal citation and quotation marks omitted). As for the "in furtherance" requirement, "the mailings need not be an 'essential element' of the scheme." *Hebshie*, 549 F.3d at 36 (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)). The mailings need not even contain false information. *McCann*, 366 F.3d at 51. It suffices if the mailings are "sufficiently closely related to the scheme, such that they are incident to an essential part of the

scheme, or a step in [the] plot." *Hebshie*, 549 F.3d at 36 (internal citation and quotation marks omitted; alteration in original).

Ample evidence established the mailing element for each of the mail fraud charges against Soto. The schemes to defraud in those charges were schemes to procure loans from mortgage lenders on the basis of false information. The evidence established that each of these schemes was consummated at a closing where the lender handed over the funds for the purchase of a particular property. *See supra* pp. 3-9. After the closing for each transaction, the closing documents associated with the transaction were mailed to the lender.

Despite Steven Soto's contentions to the contrary, Steven *Pro Se* Br. 8-9, there was extensive evidence that the closing documents were mailed to the lenders. The closing documents for each of the transactions contained instructions from the lender to its agent, the closing attorney, directing that the closing attorney send the closing documents to the lender at a physical address. Ex. 1A, at 64; Ex. 2A, at 44; Ex. 3A, at 31; Ex. 4A, at 59; Ex. 5A, at 78. Witnesses testified that they mailed the closing documents to the lenders in accordance with those instructions. Dkt. 308, at 128, 136; Dkt. 309, at 18-19, 34; Dkt. 310, at 40; Dkt. 311, at 49-50; Dkt. 312, at 129-30; Dkt. 313, at 58, 60-61; Dkt. 314, at 148-49, 156-57; Dkt. 316, at 163-67. Consistent with that

60

testimony, the government introduced, for each transaction, the closing

documents from the files of the closing attorney, *see* Exs. 1A, 2A, 3A, 4A, 5A,

as well as the corresponding closing documents from the files of the lender, *see*

Exs. 1B, 2B, 3B, 4B, 5B. The jury was entitled to conclude from this evidence

that the closing documents were in fact mailed to the lenders. Steven Soto's

sufficiency argument is meritless.

### VII.   Steven Soto's Double Jeopardy Claim is Waived But in Any Event Lacks Merit

In this case, Steven Soto was convicted on five counts of mail fraud, in

violation of 18 U.S.C. § 1341, and six counts of aggravated identity theft, in

violation of 18 U.S.C. § 1028A. SA 488-90. Previously, in 2011, Soto was

convicted, after a jury trial, on four counts of mail fraud, in violation of 18

U.S.C. § 1341; three counts of wire fraud, in violation of 18 U.S.C. § 1343; two

counts of bank fraud, in violation of 18 U.S.C. § 1344; and eight counts of

aggravated identity theft, in violation of 18 U.S.C. § 1028A. *Soto*, 720 F.3d at

53-54 & n.1. The bases for those convictions were Soto's use of Bradley's

identity to purchase three automobiles and his use of counterfeit checks and

the counterfeit Espinal notary kit to purchase three motorcycles in March and

April 2006. *Id.* at 54.

During the trial in this case, Soto filed a *pro se* motion to dismiss the mail fraud and aggravated identity theft charges on double jeopardy grounds. Dkt. 181. Soto's counsel determined that the motion lacked merit and declined to file the motion as counsel of record, but counsel accommodated Soto by transmitting the motion to the court. Dkt. 298, at 243-45; Dkt. 319, at 173; *see United States v. Washington*, 434 F.3d 7, 16 (1st Cir. 2006).

Soto argued that dismissal of the aggravated identity theft charges was required because his prior convictions for violating the same statute, 18 U.S.C. § 1028A, involved "the use of the same identities—Bradley and Espinal." Dkt. 181, at 3. He contended that dismissal of the mail fraud charges was required because those charges allegedly rested on the same evidence as his prior convictions for aggravated identity theft, namely the use of the same identities (Bradley and Espinal), the same accomplices (*e.g.*, Kim Litwin and Yessica Amaro), the same bank accounts, and the same computers. Dkt. 181, at 3-4.

The district court, in an exercise of its discretion, declined to consider Soto's *pro se* motion. Dkt. 318, at 11 (citing *United States v. Tracy*, 989 F.2d 1279, 1285 (1st Cir. 1993)); *see also* Dkt. 319, at 17, 169, 175. The court nonetheless concluded that the motion was untimely, Dkt. 319, at 169-70, 174-75, and that Soto was not prejudiced by his counsel's refusal to file the motion because it lacked merit, Dkt. 319, at 175-76.

Soto seeks to renew his double jeopardy argument, Steven *Pro Se* Br. 5-7, but the claim is waived. A motion "alleging a defect in instituting the prosecution" or "a defect in the indictment" "must be raised before trial." Fed. R. Crim. P. 12(b)(3)(A), (B); *United States v. Walker*, 665 F.3d 212, 227-28 (1st Cir. 2011). Failure to raise an alleged double jeopardy violation prior to trial waives the claim where, as here, the claim could have been brought on the basis of the allegations in the indictment. *See United States v. Weathers*, 186 F.3d 948, 953 (D.C. Cir. 1999); *United States v. Marrero*, 991 F.2d 786, 1993 WL 89804, at *1 (1st Cir. 1993) (unpublished); *see also* Dkt. 298, at 243-44 (district court finding that "[a]ny alleged double jeopardy [claim] could have been filed" before trial).

Even assuming the claim is not waived, Soto's double jeopardy argument lacks merit. The Double Jeopardy Clause of the Fifth Amendment protects against, among other things, successive prosecutions for the same offense. *See United States v. Neto*, 659 F.3d 194, 200 (1st Cir. 2011). Conversely, successive prosecutions for different criminal offenses, including prosecutions under the same statute, are not barred by the Double Jeopardy Clause. *United States v. DeCologero*, 530 F.3d 36, 71-72 (1st Cir. 2008); *United States v. Morris*, 99 F.3d 476, 480 (1st Cir. 1996); *United States v. Chagra*, 653 F.2d 26, 29 (1st Cir. 1981); *see United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012). That is

63

the case even if there is overlap in the evidence required to prove the successive charges. *United States v. Felix*, 503 U.S. 378, 386 (1992).

Soto's prosecution for mail fraud and aggravated identity theft in 2011 and his prosecution on those charges in this case were not for the "same offenses" for purposes of the Double Jeopardy Clause. *See United States v. DeCologero*, 364 F.3d 12, 18 (1st Cir. 2004) ("[D]ouble jeopardy only bars successive RICO charges involving both the same enterprise and the same pattern of racketeering activity."). The fraud charges in the 2011 prosecution targeted Soto's schemes to obtain cars and motorcycles, whereas the mail fraud charges in this case targeted Soto's schemes to obtain loans from mortgage lenders. The charges in the two cases "do not grow out of a single criminal act, occurrence, episode or transaction." *Chagra*, 653 F.3d at 29. Likewise, the use of identification from Espinal or Bradley during and in relation to each of these schemes was separately chargeable under the aggravated identity theft statute, despite the use of the same identification in multiple schemes. *Cf. United States v. Cejas*, 761 F.3d 717, 729-32 (7th Cir. 2014) (two convictions for possession of a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c), did not violate the Double Jeopardy Clause where the same gun was possessed during two separate drug trafficking crimes that occurred on different dates).

64

## VIII. The District Court Did Not Plainly Err in Ordering Carmen Soto to Pay $792,559 in Restitution

Carmen Soto contends that error in the district court's restitution order requires remand for additional findings. Carmen Br. 20-27. In particular, she argues that the district court must make findings as to what portion of the $792,559 in losses suffered by the mortgage lenders was proximately caused by her conduct. Carmen Br. 27. Her argument lacks merit.

### A. Background

#### 1. The Presentence Investigation Report

The Presentence Investigation Report (PSR) for Carmen Soto calculated her advisory Sentencing Guidelines range to be 46 to 57 months of imprisonment (offense level 23, criminal history category I). PSR ¶¶ 28, 35, 87. As relevant here, the PSR calculated Soto's offense level in accordance with Guidelines § 2B1.1, which requires an increase in the offense level for a fraud conviction based on the amount of loss, which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(A); *see* PSR ¶¶ 20-21. Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

The PSR concluded that the actual loss to the mortgage lenders from Carmen Soto's offense conduct was $792,559. PSR ¶¶ 12, 21. The PSR

65

reached that figure by reducing the money lent by the amounts retrieved by the

lenders in selling the properties after foreclosure:

| Property | Lender | Loan Amount | Foreclosure Sale Price | Loss |
|---|---|---|---|---|
| 55 Lawrence St. Unit 2 | Homecomings Financial | $225,000 | $54,000 | $171,000 |
| 55 Lawrence St. Unit 3 | IndyMac Bank, FSB | $230,000 | $57,691 | $172,309 |
| 21 Dudley St. Unit 1 | First Horizon Home Loan | $190,000 | $29,000 | $161,000 |
| 21 Dudley St. Unit 2 | First Horizon Home Loan | $175,000 | $33,500 | $141,500 |
| 21 Dudley St. Unit 3 | First Horizon Home Loan | $175,000 | $28,250 | $146,750 |
| | | | | **Total:** $792,559 |

*See* PSR ¶ 12. The PSR also concluded that, in accordance with 18 U.S.C.

§ 3663A, Soto owed those same amounts as restitution to each of the

respective lenders. PSR ¶ 102.

Soto objected to the PSR's loss calculation. PSR pp. 24-26; Dkt. 212, at

2-4; CA 257-270. She argued, in relevant part, that it was not reasonably

foreseeable that the housing market would collapse and that the lenders would

sell the properties at prices that, according to Soto, were below what they

could have and should have obtained. Dkt. 212, at 2-4; CA 47, 50. She also

argued that a departure or variance from the Guidelines range was warranted

because there were other causes— in addition to her own conduct—for the

losses suffered by the mortgage lenders, namely the collapse of the housing

market and excessive permissiveness by the lenders in providing the loans.

Dkt. 212, at 4; CA 367-71.

### 2.    The Sentencing Hearing

The district court overruled Soto's objections to the loss calculation and concluded that the PSR correctly calculated Soto's Guidelines range. CA 288-91, 304-07, 326-31, 391-93. The court concluded that the actual loss was higher than the intended loss and that "actual loss should ordinarily be calculated using the amount of the loan less what was recouped in foreclosure." CA 288-89 (citing *United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012)). The court also concluded that those losses were reasonably foreseeable to Soto. CA 290-91. She had a "long histor[y] in the real estate business." CA 290. She and the other defendants were "knowledgeable" and knew there was "a very vulnerable market, that 'closing is king,' that appraisals [were] easy to acquire, [and] that downpayments [were] not necessary." CA 290. The defendants also "had no intention . . . that these mortgages would be paid off" and therefore "foresaw that there would be foreclosures with regard to their transactions." CA 290. Each of the defendants, the court concluded, "foresaw that foreclosure sales would result in losses to the lender," which "would be a reasonable thing for somebody with their knowledge and experience . . . to foresee." CA 291.

The court varied downward from the Guidelines range, however, and sentenced Soto to a year and a day of imprisonment. CA 379, 383. The court varied downward "primarily and substantially" due to Carmen Soto's health, citing "the need to monitor and if necessary promptly treat any recurrence of her cancer." CA 378, 392. The court also varied downward because it found "that the amount of loss was caused in part by market practices that made it particularly easy for the defendants to perpetrate their frauds and permitted them to get more money than their fraudulent schemes ordinarily would have permitted them to obtain." CA 378 (citing, *inter alia*, *United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995)); *see* CA 391-92. In addition, the court ordered that Carmen "pay restitution in the amount of $792,559 as provided on Page 29 of" the PSR. CA 383.

Defense counsel stated that the restitution order was "substantial and . . . for the full amount of loss," and that in imposing sentence the court "essentially [gave] the defendants some credit in terms of time for the market, for what I think you referred to as the 'market practice at the time.'" CA 402-03. Defense counsel said "I'm concerned by that apparent," at which point the district court interjected and asked whether there was "a real prospect that [Carmen Soto will] be able to pay" the ordered restitution. CA 403. Defense counsel responded, "Never." CA 403. The court said it had considered

68

imposing a fine payable to the U.S. Treasury but "believe[d] that [the restitution] order is correct." CA 403. Defense Counsel thereafter did not pursue an objection to the restitution order. CA 403.

### B.     Standard of Review

This Court reviews a restitution order "for abuse of discretion and the subsidiary findings of fact for clear error." *United States v. Antonakopoulos*, 399 F.3d 68, 83 (1st Cir. 2005). When a party has failed to interpose a timely objection in the sentencing court, however, the Court reviews for plain error. *United States v. Salas-Fernandez*, 620 F.3d 45, 48 (1st Cir. 2010). An objection on the specific grounds asserted on appeal is required to avoid plain error review. *United States v. Matos*, 611 F.3d 31, 48 (1st Cir. 2010).

The Court should review Carmen Soto's restitution claim for plain error. Although defense counsel stated that he was "concerned" about the restitution order, he did not interpose a specific objection. *See* CA 402-03. Soto did not contend, as she now argues on appeal, that her offense conduct was not the proximate cause of all the $792,559 in losses suffered by the lenders. *See* CA 402-03. The vague "concern" expressed by Soto at sentencing did not preserve this specific issue for appeal. *See Matos*, 611 F.3d at 48.

### C.    Argument

Soto identifies no error in the restitution order, plain or otherwise. The Mandatory Victims Restitution Act of 1996 (MVRA) provides that a district court must order a defendant convicted of fraud to "make restitution to the victim of the offense." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). As relevant here, the statute provides that, when return of the property lost by the victim is "impossible, impracticable, or inadequate," the defendant must pay the victim "an amount equal to . . . the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). In the case of a fraudulently obtained loan, "any part of the property" refers to the money lent, and therefore "no 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale." *Robers v. United States*, 134 S. Ct. 1854, 1856 (2014). The district court was therefore correct in ordering restitution in the amount of the money lent by the victims reduced by "the amount of money the victim[s] received in selling the collateral." *Id.*

Soto contends that the district court erred because it did not "determine the loss proximately caused by" her offense conduct. Carmen Br. 21. It is true that the MVRA contains a proximate causation requirement. 18 U.S.C. § 3663A(a)(2); *see Robers*, 134 S. Ct. at 1859. The district court did not

70

explicitly refer to proximate cause in ordering restitution, because Soto did not raise an objection based on proximate cause at sentencing. The court nonetheless made adequate findings in support of proximate causation. As this Court has explained, proximate causation is established where the evidence "show[s] that the defendant's conduct created a reasonably foreseeable risk of harm to the victim." *Chiaradio*, 684 F.3d at 284; *see Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) ("Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."). As a result, when the district court made a finding that the losses suffered by the lenders were reasonably foreseeable to the defendants, *see* CA 290-91, the court necessarily concluded that Soto's conduct was the proximate cause of those losses. That finding was not clearly or obviously erroneous. Far from it: as the district court explained at length, *see* CA 290-91, there was ample support in the record for that finding.

Soto contends that the district court's determination of loss for purposes of Guidelines § 2B1.1 was an inadequate measure of restitution. Carmen Br. 25. It is true that "intended or probable loss cannot be the measure of restitution." *United States v. Stern*, 13 F.3d 489, 498 (1st Cir. 1994); *cf. United States v. Innarelli*, 524 F.3d 286, 290 n.4 (1st Cir. 2008) ("[F]or purposes of determining the restitution portion of a defendant's punishment, only actual

71

loss may be taken into account."). The district court here, however, determined loss on the basis of "actual loss," which—in contrast to intended loss—requires a finding of reasonable foreseeability. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(i). The district court therefore implicitly made a finding of proximate causation when, in determining actual loss for purposes of the Guidelines, it made specific findings that the losses were reasonably foreseeable to Soto.

Soto also contends that the district court's stated basis for varying from the Guidelines range contradicted a finding that her conduct was the proximate cause of the total losses suffered by the lenders. Carmen Br. 26. According to Soto, because the district court concluded that her conduct was one of "multiple causes" for the losses suffered by the lenders—another being the "market practices that made it particularly easy" for the defendants to fraudulently obtain loans, CA 378—it cannot also be the case that her conduct proximately caused all of those losses. *See* Carmen Br. 26. Soto misconstrues the concept of proximate causation. A defendant's conduct may be the proximate cause of harm even if others also "contributed to that harm." *Chiaradio*, 683 F.3d at 284. "Proximate cause exists where the tortious conduct of multiple actors has combined to bring about harm, even if the harm suffered by the [victim] might be the same if one of the numerous tortfeasors had not committed the tort." *United States v. Kearney*, 672 F.3d 81, 98 (1st Cir. 2012).

The district court's multiple cause and proximate causation findings therefore were not inconsistent or mutually exclusive. *See BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011) (distinguishing multiple causes from proximate cause).

It was well within the district court's discretion to vary downward from the advisory Guidelines range on the basis of a finding that there were multiple causes of the victims' losses. *See generally United States v. Gallardo-Ortiz*, 666 F.3d 808, 811 (1st Cir. 2012) (sentencing court has wide discretion in varying based on sentencing factors set forth in 18 U.S.C. § 3553(a)). In contrast, the court's restitution order was not discretionary. *See* 18 U.S.C. § 3663A(a)(1). Once the court concluded that the losses suffered by the lenders were a reasonably foreseeable result of Carmen Soto's conduct, the court was required to order restitution in that full amount. *See* 18 U.S.C. § 3664(f)(1)(A). The court's restitution order should be affirmed.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments of conviction and sentence.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

JOHN A. CAPIN
BRIAN A. PÉREZ-DAPLE
Assistant U.S. Attorneys
District of Massachusetts

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney General

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

November 3, 2014

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND LENGTH LIMITATIONS

1.    The Court granted the government leave to file a brief containing 17,000 words. This brief contains 16,837 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced, 14-point serif typeface using Microsoft Office Word 2007.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on November 3, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system to:

Matthew A. Kamholtz
Feinberg & Kamholtz
1 South Market Building, 4th Floor
Faneuil Hall Marketplace
Boston, MA 02109

Steven A. Feldman
Feldman & Feldman
626 Reckson Plaza
West Tower, Sixth Floor
Uniondale, NY 11556

Benjamin L. Falkner
Krasnoo | Klehm LLP
28 Andover Street, Suite 240
Andover, MA 01810

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

76